**Edward DeSANTIS, et al., Petitioners,**

v.

**WACKENHUT
CORPORATION, Respondent.**

**No. C-6617.**

Supreme Court of Texas.

June 6, 1990.

---

**672**　

Jon Mercer, Theodore C. Flick, Houston, for petitioners.

William H. Bruckner, Roxella T. Cavazos, Judith Batson Sadler, Sylvia Davidow, Houston, for respondent.

## ON MOTION FOR REHEARING

HECHT, Justice.

On motions for rehearing, our opinion and judgment of July 13, 1988, are withdrawn, and the following is now the opinion of the Court.

This case involving a noncompetition agreement between an employer and employee presents three principal issues: first, whether the law of the state chosen by the parties to govern their agreement should be applied; second, whether the noncompetition agreement is enforceable; third, if the agreement is not enforceable, whether damages for its attempted enforcement are recoverable under the Texas Free Enterprise and Antitrust Act of 1983 or for wrongful injunction, fraud, or tortious interference with contract.

The trial court applied the law of the state of Florida, chosen by the parties to govern the noncompetition agreement, to hold the agreement valid but overly broad

as to the geographical territory in which competition was restricted. Based upon a jury finding that the employee breached the agreement, the trial court enjoined any further violation of the agreement within a smaller territory, and denied the employee's claims for damages. The court of appeals affirmed. 732 S.W.2d 29. We hold that Texas law, not Florida law, applies in this case, and that under Texas law, the noncompetition agreement is unenforceable. We further hold that the employee is not entitled to recover damages for his employer's wrongfully obtaining an injunction against him, and that the employee has failed to show fraud, tortious interference, or a violation of the Texas Free Enterprise and Antitrust Act entitling him to damages. We accordingly reverse the judgment of the court of appeals and render judgment in accordance with this opinion.

## I

### A

Edward DeSantis has been providing international and corporate security services, both in the CIA and the private sector for his entire career. In June 1981, while employed by R.J. Reynolds Industries in North Carolina, DeSantis interviewed for a position with Wackenhut Corporation. At that time, Wackenhut, which was chartered and headquartered in Florida, was the third largest company in the nation specializing in furnishing security guards for businesses throughout the country. DeSantis met with Wackenhut's president, founder, and majority stockholder, George Wackenhut, at the company's offices in Florida, and the two agreed that DeSantis would immediately assume the position of Wackenhut's Houston area manager. According to DeSantis, George Wackenhut promised him that the area manager's position was only temporary, and that he would soon be moved into a top executive position. George Wackenhut denies that he made any such promises to DeSantis, admitting only that he mentioned advancement to an executive position as a possible opportunity.

At Wackenhut's request, DeSantis signed a noncompetition agreement at the inception of his employment. The agreement recites that it was "made and entered into" on August 13, 1981, in Florida, although DeSantis signed it in Texas. It also recites consideration "including but not limited to the Employee's employment by the Employer". In the agreement DeSantis covenanted that as long as he was employed by Wackenhut and for two years thereafter, he would not compete in any way with Wackenhut in a forty-county area in south Texas. DeSantis expressly acknowledged that Wackenhut's client list "is a valuable, special and unique asset of [Wackenhut's] business" and agreed never to disclose it to anyone. DeSantis also agreed never to divulge any confidential or proprietary information acquired through his employment with Wackenhut. Finally, DeSantis and Wackenhut agreed "that any questions concerning interpretation or enforcement of this contract shall be governed by Florida law."

DeSantis remained manager of Wackenhut's Houston office for nearly three years, until March 1984, when he resigned under threat of termination. DeSantis contends that he was forced to quit because of disagreements with Wackehut's senior management over the profitability of the Houston office. Wackenhut contends that DeSantis was asked to resign because of his unethical solicitation of business.

Following his resignation, DeSantis invested in a company which marketed security electronics. He also formed a new company, Risk Deterrence, Inc. ("RDI"), to provide security consulting services and security guards to a limited clientele. The month following termination of his employment with Wackenhut, DeSantis sent out letters announcing his new ventures to twenty or thirty businesses, about half of which were Wackenhut clients. He added a postscript to letters to Wackenhut clients in which he disclaimed any intent to interfere with their existing contracts with Wackenhut. Within six months, however, one of Wackenhut's clients, Marathon Oil Company, had terminated its contract with Wackenhut and signed a five-year contract

with RDI, and a second Wackenhut client, TRW–Mission Drilling Products, was considering doing the same. Wackenhut claims that DeSantis was acquiring its clients in violation of the noncompetition agreement. DeSantis claims that these clients began considering other security service providers only after the quality of Wackenhut's services declined, following DeSantis' departure.

### B

Wackenhut sued DeSantis and RDI in October 1984 to enjoin them from violating the noncompetition agreement, and to recover damages for breach of the agreement and for tortious interference with business relations. Wackenhut alleged that DeSantis and RDI were soliciting its clients' business using confidential client and pricing information which DeSantis obtained through his employment with Wackenhut. The trial court issued an ex parte temporary restraining order against DeSantis and RDI, and fixed the amount of the requisite bond which Wackenhut filed at $5,000. Following a hearing, the trial court issued a temporary injunction upon a $75,000 bond, which Wackenhut also filed. DeSantis and RDI counterclaimed against Wackenhut, alleging that Wackenhut had fraudulently induced DeSantis to sign the noncompetition agreement, that the agreement violated state antitrust laws, and that enforcement of the agreement by temporary injunction was wrongful and tortiously interfered with DeSantis and RDI's contract and business relationships. RDI claimed damages for loss of the Marathon contract, which Marathon terminated after the injunction issued, for loss of the TRW business, and for injury to its reputation. DeSantis claimed damages for lost salary, impaired reputation, and mental anguish. DeSantis and RDI both sought statutory damages under the Texas Free Enterprise and Antitrust Act, Texas Business and Commerce Code Annotated sections 15.01–15.51 (Vernon 1987 and Supp.1990), and exemplary damages.

■ The trial court granted Wackenhut's motion for summary judgment on DeSantis and RDI's claim for tortious interference, and directed a verdict against them on their fraud claim. At trial, Wackenhut withdrew its tortious interference claim. A jury found that DeSantis breached the noncompetition agreement by competing with Wackenhut, but failed to find that Wackenhut would be irreparably harmed if DeSantis were not prohibited from further breaching the agreement.[1] The jury also failed to find that Wackenhut had ever been unfair, unjust, misleading or deceptive to DeSantis so as to cause him any injury. The jury found that Wackenhut's enforcement of the noncompetition agreement had caused DeSantis no damages, but had caused RDI to lose profits from Marathon's and TRW's business in the amount of $9,000 in the past and a like amount in the future.

The trial court concluded that irreparable harm to Wackenhut was either presumed from DeSantis' breach of the agreement under Florida law, or established as a matter of law because of the absence of an adequate legal remedy for breach of the agreement under Texas law. Accordingly, the trial court permanently enjoined DeSantis from competing with Wackenhut, and RDI from employing DeSantis to compete with Wackenhut, for two years from the date DeSantis left Wackenhut in an area reduced by the trial court from the forty counties stated in the agreement to the thirteen counties found by the trial court to be reasonably necessary to protect Wackenhut's interest. The trial court also permanently enjoined DeSantis from divulging Wackenhut's client list or proprietary information, and RDI from using any proprietary information of Wackenhut's acquired through DeSantis. The trial court denied all relief requested by DeSantis and RDI, based upon the jury's finding that DeSantis had breached his agreement with Wackenhut. The trial court awarded Wackenhut attorney's fees and costs.

---

**1.** Whether a party has been or will be irreparably harmed is not a jury issue, although factual issues to be considered by the court in making that determination may be. *See, State v. Texas Pet Foods, Inc.,* 591 S.W.2d 800, 803–804 (Tex. 1979).

The court of appeals affirmed the judgment of the trial court in all respects.

## II

We first consider what law is to be applied in determining whether the noncompetition agreement in this case is enforceable. Wackenhut contends that Florida law applies, as expressly agreed by the parties. DeSantis argues that Texas law applies, despite the parties' agreement.

## A

This Court has not previously addressed what effect should be given to contractual choice of law provisions. We begin with what Chief Justice Marshall referred to as a principle of "universal law ... that, in every forum, a contract is governed by the law with a view to which it was made." *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 48, 6 L.Ed. 253 (1825). This principle derives from the most basic policy of contract law, which is the protection of the justified expectations of the parties. *See* E. SCOLES & P. HAY, CONFLICT OF LAWS 632 (1984) ["SCOLES"]; Reese, *Choice of Law in Torts and Contracts and Directions for the Future,* 16 COLUM.J. TRANSNAT'L L. 1, 21 (1977). The parties' understanding of their respective contractual rights and obligations depends in part upon the certainty with which they may predict how the law will interpret and enforce their agreement. *Id.*

■ When parties to a contract reside or expect to perform their respective obligations in multiple jurisdictions, they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations. This conflict of laws concept has come to be referred to as party autonomy. *See* R. WEINTRAUB, COMMENTARY ON THE CONFLICT OF LAWS 269–271 (1971) ["WEINTRAUB"]. However, the parties' freedom to choose what jurisdiction's law will apply to their agree-

ment cannot be unlimited. They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply. So limited, party autonomy furthers the basic policy of contract law. With roots deep in two centuries of American jurisprudence, limited party autonomy has grown to be the modern rule in contracts conflict of laws. *See* SCOLES, *supra* at 632–652; WEINTRAUB, *supra* at 269–275; RESTATEMENT (SECOND) OF CONFLICT OF LAWS ["THE RESTATEMENT"] § 187 (1971).

■ The party autonomy rule has been recognized in this state. The Legislature has provided in the Uniform Commercial Code:

> [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.

TEX.BUS. & COM.CODE ANN. § 1.105(a) (Vernon Supp.1989). In a different context, one court of appeals has elaborated further:

> [A]n express agreement of the parties that the contract is to be governed by the laws of a particular state will be given effect if the contract bears a reasonable relation to the chosen state and no countervailing public policy of the forum demands otherwise.

*First Commerce Realty Investors v. K–F Land Co.,* 617 S.W.2d 806, 808–809 (Tex. Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (citing, *inter alia,* the RESTATEMENT § 187). We believe the rule is best formulated in section 187 of the RESTATEMENT and will therefore look to its provisions in our analysis of this case.

## B

■ Section 187 states:

Law of the State Chosen by the Parties
(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particu-

lar issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue. (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

The issue before us—whether the noncompetition agreement in this case is enforceable—is not "one which the parties could have resolved by an explicit provision in their agreement". *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 comment d (1971). We therefore apply section 187(2).

The parties in this case chose the law of Florida to govern their contract. Florida has a substantial relationship to the parties and the transaction because Wackenhut's corporate offices are there, and some of the negotiations between DeSantis and

George Wackenhut occurred there. Thus, under section 187(2) Florida law should apply in this case unless it falls within the exception stated in section 187(2)(b). Whether that exception applies depends upon three determinations: first, whether there is a state the law of which would apply under section 188 of the RESTATEMENT absent an effective choice of law by the parties, or in other words, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether this noncompetition agreement should be enforced; and third, whether that state's fundamental policy would be contravened by the application of the law of the chosen state in this case. More particularly, we must determine: first, whether Texas has a more significant relationship to these parties and their transaction than Florida; second, whether Texas has a materially greater interest than Florida in deciding the enforceability of the noncompetition agreement in this case; and third, whether the application of Florida law in this case would be contrary to fundamental policy of Texas.

1

Section 188 of the RESTATEMENT provides that a contract is to be governed by the law of the state that "has the most significant relationship to the transaction and the parties", taking into account various contacts in light of the basic conflict of laws principles of section 6 of the RESTATEMENT.[2] In this case, that state is Texas.

---

2. Section 188 of the RESTATEMENT states in full:
Law Governing in Absence of Effective Choice by the Parties
(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,

(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.
Section 6 of the RESTATEMENT states:
Choice-of-Law Principles

Wackenhut hired DeSantis to manage its business in the Houston area. Although some of the negotiations between DeSantis and Wackenhut occurred in Florida, the noncompetition agreement was finally executed by DeSantis in Houston.[3] The place of performance for both parties was Texas, where the subject matter of the contract was located. Wackenhut may also be considered to have performed its obligations in part in Florida, from where it supervised its various operations, including its Houston office. Still, the gist of the agreement in this case was the performance of personal services in Texas. As a rule, that factor alone is conclusive in determining what state's law is to apply. *See* RESTATEMENT § 196 (1971);[4] *see also Schulke Radio Prod. Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 453 N.E.2d 683, 685–6 (1983); *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 601 P.2d 1369, 1373 (1979); *Graham v. Wilkins*, 145 Conn. 34, 138 A.2d 705, 708 (1958). In this case, the relationship of the transaction and parties to Texas was clearly more significant than their relationship to Florida.

### 2

Texas has a materially greater interest than does Florida in determining whether the noncompetition agreement in this case is enforceable. At stake here is whether a Texas resident can leave one Texas job to start a competing Texas business. Thus, Texas is directly interested in DeSantis as

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

an employee in this state, in Wackenhut as a national employer doing business in this state, in RDI as a new competitive business being formed in the state, and in consumers of the services furnished in Texas by Wackenhut and RDI and performed by DeSantis. Texas also shares with Florida a general interest in protecting the justifiable expectations of entities doing business in several states. Florida's direct interest in the enforcement of the noncompetition agreement in this case is limited to protecting a national business headquartered in that state. Although it is always problematic for one state to balance its own interests fairly against those of another state, the circumstances of this case leave little doubt, if any, that Texas has a materially greater interest than Florida in deciding whether the noncompetition agreement in this case should be enforced.

### 3

Having concluded that Texas law would control the issue of enforceability of the noncompetition agreement in this case but for the parties' choice of Florida law, and that Texas' interest in deciding this issue in this case is materially greater than Florida's, we must finally determine under section 187(2)(b) of the RESTATEMENT whether application of Florida law to decide this issue would be contrary to fundamental policy of Texas. The RESTATEMENT offers little guidance in making this determination. Comment *g* states only that a "fun-

3. The covenant itself states that it was executed in Florida, but testimony for both parties established that DeSantis signed it last in Houston.

4. Section 196 states:
 Contracts for the Rendition of Services
 The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

damental" policy is a "substantial" one, and that "[t]he forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule...."

■ Comment *g* to section 187 does suggest that application of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law. We agree that the result in one case cannot determine whether the issue is a matter of fundamental state policy for purposes of resolving a conflict of laws. Moreover, the fact that the law of another state is materially different from the law of this state does not itself establish that application of the other state's law would offend the fundamental policy of Texas. In analyzing whether fundamental policy is offended under section 187(2)(b), the focus is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction.[5]

Neither the RESTATEMENT nor the cases which have followed section 187 have undertaken a general definition of "fundamental policy", and we need not make the attempt in this case; for whatever its parameters, enforcement of noncompetition agreements falls well within them. This Court has held that "[a]n agreement not to compete is in restraint of trade and will not be enforced unless it is reasonable." *Frankiewicz v. National Comp Assoc.*, 633 S.W.2d 505, 507 (Tex.1982); *accord Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950, 951 (1960). As a general rule, unreasonable restraints of trade, including unreasonable covenants not to compete, contravene public policy. *See Denny v. Roth*, 296 S.W.2d 944, 947 (Tex.Civ.App.—Galveston 1956, writ ref'd);

RESTATEMENT (SECOND) OF CONTRACTS §§ 186–188 (1981); 14 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 1633–1635 (3d ed. 1972). What noncompetition agreements are reasonable restraints upon employees in this state, therefore, is a matter of public policy. Moreover, that policy is fundamental in that it ensures a uniform rule for enforcement of noncompetition agreements in this state. *See* RESTATEMENT § 187 comment g (1971) ("a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power"). Absent such a policy, agreements involving residents of other states would be controlled by the law and policy of those states. An employee of one out-of-state employer might take a competing job and escape enforcement of a covenant not to compete because of the law of another state, while a neighbor suffered enforcement of an identical covenant because of the law of a third state. The resulting disruption of orderly employer-employee relations, as well as competition in the marketplace, would be unacceptable. Employers would be encouraged to attempt to invoke the most favorable state law available to govern their relationship with their employees in Texas or other states.

These same considerations and others have led virtually every court that has addressed the question of whether enforcement of noncompetition agreements is a matter of fundamental or important state policy to answer affirmatively. Not many of these courts have considered the matter specifically in the context of section 187 of the RESTATEMENT, and yet, rather remarkably, many have nevertheless expressed similar conclusions. *See Dresser Indus., Inc. v. Sandvick*, 732 F.2d 783, 787–788 (10th Cir.1984) ("the tendency of the courts [is] to apply the policy of the forum state when parties are litigating covenants not to com-

---

**5.** The trial court apparently concluded that this noncompetition agreement is enforceable under both Texas and Florida law. The court of appeals concluded that the agreement is enforceable under Florida law and did not consider whether it is enforceable under Texas law. DeSantis appears to concede that the agreement is enforceable under Florida law. Wackenhut strongly argues that the agreement is enforceable under Texas law.

pete"); *Nordson Corp. v. Plasschaert,* 674 F.2d 1371, 1375 (11th Cir.1982); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham,* 658 F.2d 1098, 1100 n. 5 (5th Cir.1981); *Davis v. Jointless Fire Brick Co.,* 300 F. 1, 3–4 (9th Cir.1924); *Muma v. Financial Guardian, Inc.,* 551 F.Supp. 119, 121–123 (E.D.Mich.1982); *Walling Chem. Co. v. Hart,* 508 F.Supp. 338, 340 (D.Neb.1981); *Fort Smith Paper Co. v. Sadler Paper Co.,* 482 F.Supp. 355, 357 (E.D.Ok.1979); *Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123, 127 (S.D. Ala.1978), *aff'd per curiam,* 599 F.2d 743 (5th Cir.1979); *Associated Spring Corp. v. Roy F. Wilson & Avnet, Inc.,* 410 F.Supp. 967, 976–978 (D.S.C.1976); *Fine v. Property Damage Appraisers, Inc.,* 393 F.Supp. 1304, 1310 (E.D.La.1975); *Boyer v. Piper, Jaffray & Hopwood, Inc.,* 391 F.Supp. 471, 473 (D.S.D.1975); *Forney Indus., Inc. v. Andre,* 246 F.Supp. 333, 334–335 (D.N.D. 1965); *Nasco, Inc. v. Gimbert,* 239 Ga. 675, 238 S.E.2d 368, 369 (1977); *Standard Register Co. v. Kerrigan,* 238 S.C. 54, 119 S.E.2d 533, 541–542 (1961); *Temporarily Yours–Temporary Help Services, Inc. v. Manpower, Inc.,* 377 So.2d 825, 827 (Fla. Dist.Ct.App.1979); *see also Barnes Group, Inc. v. C & C Products, Inc.,* 716 F.2d 1023, 1031–1032 (4th Cir.1983); *Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883, 886–888 (1987) (suit for unfair termination).

We likewise conclude that the law governing enforcement of noncompetition agreements is fundamental policy in Texas,

and that to apply the law of another state to determine the enforceability of such an agreement in the circumstances of a case like this would be contrary to that policy. We therefore hold that the enforceability of the agreement in this case must be judged by Texas law, not Florida law.

### III

We now consider whether the noncompetition agreement between DeSantis and Wackenhut is enforceable under Texas law. We must also consider the effect upon this case of certain legislation passed while this case has been pending before this Court.

### A

▮ The fundamental common law principles which govern the enforceability of covenants not to compete in Texas are relatively well established. An agreement not to compete is in restraint of trade and therefore unenforceable on grounds of public policy[6] unless it is reasonable. *Frankiewicz v. National Comp Assocs.,* 633 S.W.2d 505, 507 (Tex.1982); *Weatherford Oil Tool Co. v. Campbell,* 161 Tex. 310, 340 S.W.2d 950, 951 (1960); RESTATEMENT (SECOND) OF CONTRACTS § 186 (1981). An agreement not to compete is not a reasonable restraint of trade unless it meets each of three criteria. First, the agreement not to compete must be ancillary to an otherwise valid transaction or relationship. *Justin Belt Co. v. Yost,* 502 S.W.2d 681, 683–

---

**6.** An agreement not to compete may be unenforceable for reasons other than public policy. For example, an agreement not to compete, like any other contract, must be supported by consideration. *See B. Cantrell Oil Co. v. Hino Gas Sales,* 756 S.W.2d 781, 783 (Tex.—Corpus Christi 1988, no writ); *Travel Masters Inc. v. Star Tours, Inc.,* 742 S.W.2d 837, 841 (Tex.App.—Dallas 1987, writ dism'd w.o.j.); *Chenault v. Otis Eng'g Corp.,* 423 S.W.2d 377, 382 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n.r.e.). Consideration may include special training or knowledge afforded the promisor, but it is not limited to such things, and we specifically disapprove language to the contrary in *Bland v. Henry & Peters,* 763 S.W.2d 5 (Tex.App.—Tyler 1988, writ denied). Also, performance of a covenant not to compete, like performance of other contractual obligations, may, in certain instances at least, be excused by the promisee's own breach.

*See Langdon v. Progress Laundry & Cleaning Co.,* 105 S.W.2d 346, 347–348 (Tex.Civ.App.—Dallas 1937, writ ref'd); *Halbert v. Standley,* 488 S.W.2d 887, 889 (Tex.Civ.App.—Waco 1972, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF CONTRACTS §§ 237–249 (1981). And enforcement of an agreement not to compete may not be by injunction if the party seeking enforcement is not entitled to such equitable relief, as, for example, when that party has himself engaged in inequitable conduct, *see Vaughan v. Kizer,* 400 S.W.2d 586, 589–590 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.); *National Chemsearch Corp. v. Frazier,* 488 S.W.2d 545, 548 (Tex.Civ.App.—Waco 1972, no writ); or when that party has failed to show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy, *see Parkem Indus. Services, Inc., v. Garton,* 619 S.W.2d 428, 430–431 (Tex.Civ.App.—Amarillo 1981, no writ).

684 (Tex.1973); *Potomac Fire Ins. Co. v. State*, 18 S.W.2d 929, 934-935 (Tex.Civ. App.—Austin 1929, writ ref'd); RESTATEMENT (SECOND) OF CONTRACTS § 187 (1981). Such a restraint on competition is unreasonable unless it is part of and subsidiary to an otherwise valid transaction or relationship which gives rise to an interest worthy of protection. RESTATEMENT (SECOND) OF CONTRACTS § 187 comment b (1981). Such transactions or relationships include the purchase and sale of a business, and employment relationships. Restatement (Second) of Contracts § 188(2) (1981). Second, the restraint created by the agreement not to compete must not be greater than necessary to protect the promisee's legitimate interest. *Henshaw v. Kroenecke*, 656 S.W.2d 416, 418 (Tex.1983); *Weatherford*, 340 S.W.2d at 951; RESTATEMENT (SECOND) OF CONTRACTS § 188(1)(a) (1981). Examples of legitimate, protectable interests include business goodwill, trade secrets, and other confidential or proprietary information. Restatement (Second) of Contracts § 188 comments b, g (1981). The extent of the agreement not to compete must accordingly be limited appropriately as to time, territory, and type of activity. RESTATEMENT (SECOND) OF CONTRACTS § 188 comment d (1981); *see Frankiewicz*, 633 S.W.2d at 507; *Justin Belt*, 502 S.W.2d at 685; *Weatherford*, 340 S.W.2d at 951. An agreement not to compete which is not appropriately limited may be modified and enforced by a court of equity to the extent necessary to protect the promisee's legitimate interest, but may not be enforced by a court of law. *Weatherford*, 340 S.W.2d at 952-953. Third, the promisee's need for the protection afforded by the agreement not to compete must not be outweighed by either the hardship to the promisor or any injury likely to the public. RESTATEMENT (SECOND) OF CONTRACTS § 188(1)(b) (1981); *see Henshaw*, 656 S.W.2d at 418 (citing *Weatherford*, 340 S.W.2d at 951 (agreement may not impose undue hardship on promisor)). Before an agreement not to compete will be enforced, its benefits must be balanced against its burdens, both to the promisor and the public. Thus, such an agreement may, in a particular case, accomplish the salutary purpose of encouraging an employer to share confidential, proprietary information with an employee in furtherance of their common purpose, but must not also take unfair advantage of the disparity of bargaining power between them or too severely impair the employee's personal freedom and economic mobility. *See* RESTATEMENT (SECOND) OF CONTRACTS § 188 comments c, g (1981). Whether an agreement not to compete is a reasonable restraint of trade is a question of law for the court. *Henshaw*, 656 S.W.2d at 418.

This Court referred to these principles in *Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168 (Tex.1987). After holding the agreement not to compete in that case unreasonable and unenforceable, the Court added that agreements "which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable." 725 S.W.2d at 172. The Court did not define "common calling" or elaborate upon the purpose to be served by this additional requirement. The Court again referred to "common calling" in *Bergman v. Norris of Houston*, 734 S.W.2d 673 (Tex.1987), but did not further elucidate the phrase except to say that "[w]hether an employee is engaged in a common calling is a question of law to be decided from the facts of each individual case." *Id.* at 674. Although the Court held the covenants not to compete in *Bergman* unenforceable because the promisees were engaged in a common calling, it is apparent from the recitation of the evidence that the covenants would have fared no better under the principles we have set out above.

The references to "common calling" in *Hill* and *Bergman* have proven confusing in determining whether to enforce agreements not to compete. Two courts of appeals have attempted to define "common calling". *Cukjati v. Burkett*, 772 S.W.2d 215, 217 (Tex.App.—Dallas 1989, no writ); *B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 783 (Tex.App.—Corpus Christi 1988, no writ); *Travel Masters, Inc. v. Star Tours, Inc.*, 742 S.W.2d 837, 840-841 (Tex.App.—Dallas 1987, writ

dism'd w.o.j.). Another court of appeals has attempted to apply the standard without defining it. *Hoddeson v. Conroe Ear, Nose & Throat Assocs.*, 751 S.W.2d 289, 290 (Tex.App.—Beaumont 1988, no writ). Other courts have acknowledged this Court's reference to "common calling" but then reached decisions regarding the enforceability of agreements not to compete in their respective cases without attempting to apply that standard. *Posey v. Monier Resources, Inc.*, 768 S.W.2d 915, 918 (Tex.App.—San Antonio 1989, writ denied); *French v. Community Broadcasting of Coastal Bend, Inc.*, 766 S.W.2d 330, 333 (Tex.App.—Corpus Christi 1989, writ dism'd w.o.j.); *Bland v. Henry & Peters*, 763 S.W.2d 5, 7–8 (Tex.App.—Tyler 1988, writ denied); *M.R.S. Datascope Inc. v. Exchange Data Corp.*, 745 S.W.2d 542, 546 (Tex.App.—Houston [1st Dist.] 1988, no writ). One court has held that veterinary medicine is not a common calling. *Cukjati*, 772 S.W.2d at 217. Another has held, over a vigorous dissent, that a medical doctor certified as an ear, nose and throat specialist is engaged in a common calling. *Hoddeson*, 751 S.W.2d at 290.

In deciding whether an ancillary agreement not to compete is reasonable, the court should focus on the need to protect a legitimate interest of the promisee and the hardship of such protection on the promisor and the public. The nature of the promisor's job—whether it is a common calling—may sometimes factor into the determination of reasonableness, but it is not the primary focus of inquiry. The results in *Hill* and *Bergman* would have been the same irrespective of whether the promisors in those cases had been engaged in common callings. Moreover, the Legislature has now rejected common calling as a test for the reasonableness of noncompetition agreements. *See* TEX.BUS. & COM.CODE ANN. §§ 15.50–15.51 (Vernon Supp.1990). Accordingly, we do not apply "common calling". We hold instead that the principles set out above are to be applied in determining whether an agreement not to compete is reasonable.

### B

There is no dispute in this case that the agreement not to compete was ancillary to an otherwise valid relationship, *viz.*, Wackenhut's employment of DeSantis. The dispute is whether the agreement was necessary to protect some legitimate interest of Wackenhut, and whether that necessity was outweighed by the hardship of enforcement. As we have noted above, these are all questions for the court.

Wackenhut claims that the business goodwill developed for it by DeSantis was an interest protectable by an agreement not to compete. The evidence that DeSantis ever developed business goodwill for Wackenhut, however, is exceedingly slight on this record, little more than testimony that DeSantis occasionally entertained representatives of Wackenhut's clients. Indeed, Wackenhut's contention that DeSantis' unethical business solicitation led it to request his resignation tends, at least, to contradict its contention that DeSantis developed goodwill among its customers. Assuming, however, that DeSantis did develop business goodwill for Wackenhut, there is no showing that he did or even could divert that goodwill to himself for his own benefit after leaving Wackenhut. The jury found that DeSantis competed with Wackenhut after leaving its employ, and the evidence leaves little doubt that he did; but there is no finding and almost no evidence that DeSantis was able to appropriate for his own use any business goodwill that he developed for Wackenhut. Rather, the evidence is that after announcing his departure to some ten or fifteen of Wackenhut's customers, in the following six months DeSantis received business from only one of those customers and might have received business from another. There is evidence that both were considering moving their business to DeSantis' new company, RDI, because they were dissatisfied with Wackenhut's services. There is no evidence that either customer considered replacing Wackenhut with DeSantis because of the goodwill DeSantis had developed with those customers while at Wackenhut. There is simply no showing on this record that prohibiting DeSantis from competing with Wacken-

hut after he left its employ was necessary to keep DeSantis from trading on Wackenhut's business goodwill, much less any showing that the hardship of the agreement on DeSantis was outweighed by the need to protect any such interest.

Wackenhut also claims that it possessed confidential information protectable by an agreement not to compete. Specifically, Wackenhut contends that during his employ, DeSantis learned the identity of Wackenhut's customers, their special needs and requirements, and Wackenhut's pricing policies, cost factors and bidding strategies. Again, while confidential information may be protected by an agreement not to compete, Wackenhut has failed to show that it needed such protection in this case. Wackenhut failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves. Also, Wackenhut failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices

and bids could not, again, be obtained from the customers themselves. There is no evidence that DeSantis ever took advantage of any knowledge he had of Wackenhut's cost factors in trying to outbid Wackenhut or woo away its customers. Wackenhut simply has not demonstrated a need to protect any confidential information by limiting DeSantis' right to compete.

Having determined that Wackenhut has not shown that DeSantis' agreement not to compete is necessary to protect any legitimate business interest, or that the necessity of such protection outweighs the hardship of that agreement on DeSantis, we conclude that the agreement is unreasonable and therefore unenforceable.

### C

■ While this case has been pending before this Court, the Legislature has added subchapter E to the Texas Business and Commerce Code and expressly made it applicable "to a covenant entered into before, on, or after the effective date of this Act." Act of June 16, 1989, ch. 1193, § 1, 1989 Tex.Gen.Laws 4852 (effective Aug. 28, 1989).[7] Thus, this Act purports to apply to

---

7. New subchapter E added by this Act provides:

SUBCHAPTER E. COVENANTS NOT TO COMPETE

Sec. 15.50. CRITERIA FOR ENFORCEABILITY OF COVENANTS NOT TO COMPETE. Notwithstanding Section 15.05 of this code, a covenant not to compete is enforceable to the extent that it:

(1) is ancillary to an otherwise enforceable agreement but, if the covenant not to compete is executed on a date other than the date on which the underlying agreement is executed, such covenant must be supported by independent valuable consideration; and

(2) contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Sec. 15.51. PROCEDURES AND REMEDIES IN ACTIONS TO ENFORCE COVENANTS NOT TO COMPETE. (a) Except as provided in Subsection (c) of this section, a court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant.

(b) If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the

promisee has the burden of establishing that the covenant meets the criteria specified by Subdivision (2) of Section 15.50 of this code. If the agreement has a different primary purpose, the promisor has the burden of establishing that the covenant does not meet those criteria. For the purposes of this subsection, the "burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence.

(c) If the covenant meets the criteria specified by Subdivision (1) of Section 15.50 of this code but does not meet the criteria specified by Subdivision (2) of Section 15.50, the court, at the request of the promisee, shall reform the covenant to the extent necessary to cause the covenant to meet the criteria specified by Subdivision (2) of Section 15.50 and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief. If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not meet the criteria specified by Subdivision (2) of Section 15.50 and the promisee sought to enforce the cove-

the agreement not to compete before us in this case.

The obvious threshold issue which this recent legislation presents is whether it may affect litigation regarding the rights of parties to an agreement not to compete which commenced before the statute was enacted. We find it unnecessary, however, to resolve this issue in this case because we conclude that the result in this case would not be affected by the statute. Under section 15.50(2), "a covenant not to compete is enforceable to the extent that it ... contains reasonable limitations ... that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Section 15.51(b) obliges the promisee, Wackenhut in this case, to establish a protectable business interest when the matter involves rendition of personal services, as this one does. Because we have held that Wackenhut has failed to make this required showing, we cannot reform the agreement to meet either the criteria of section 15.50(2), or of *Weatherford* for that matter. The agreement not to compete in this case is no more enforceable under sections 15.50 and 15.51 of the Texas Business and Commerce Code than it would be under the above-stated common law principles governing such agreements.

Accordingly, we leave for another day the issues of whether this recent legislation affects all covenants not to compete entered into before the effective date of the Act, and how it alters the common law principles governing such covenants.

### IV

We now turn to DeSantis and RDI's contentions that they are entitled to recover on their claims against Wackenhut for wrongfully securing temporary injunctive relief, violating state antitrust laws, fraud, and tortiously interfering with contract and business relationships. We consider each of these claims in turn.

### A

DeSantis and RDI claim that Wackenhut has prosecuted this action against them maliciously, that it procured the temporary restraining order and temporary injunction against them wrongfully, and that they have suffered damages as a result. DeSantis and RDI each alleged actual damages greatly in excess of the $5,000 temporary restraining order bond and the $75,000 temporary injunction bond which Wackenhut filed.

A person who obtains an injunction wrongfully is liable for damages caused by issuance of the injunction. *Parks v. O'Connor,* 70 Tex. 377, 8 S.W. 104, 107 (1888). There are two separate causes of action for wrongful injunction, one upon the bond ordinarily filed to obtain the injunction, and the other for malicious prosecution. *See* Annot., *Liability Apart from Bond and in Absence of Elements of Malicious Prosecution for Wrongfully Suing Out Injunction,* 45 A.L.R. 1517 (1926); Annot., *Proceedings for Injunction or Restraining Order as Basis of Malicious Prosecution Action,* 70 A.L.R.3d 536 (1976). The two actions differ in the kind of wrong which must be shown to establish liability and in the amount of recovery. The few Texas cases which have addressed these differences have not been entirely clear or consistent.

A cause of action upon an injunction bond is predicated upon a breach of the condition of the bond. That condition, as prescribed by Rule 684, Texas Rules of Civil Procedure, is "that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part." To prevail upon this cause of action, the claimant must prove that the temporary restraining order or temporary injunction was issued or perpet-

---

nant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's

fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

uated when it should not have been, and that it was later dissolved. *See Craddock v. Overstreet,* 435 S.W.2d 607, 608–609 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r. e.). The claimant need not prove that the temporary restraining order or temporary injunction was obtained maliciously or without probable cause. *See Johnson v. McMahan,* 40 S.W.2d 920, 922 (Tex.Civ. App.—Amarillo 1931, writ ref'd). The purpose of the bond is to protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues. An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success on the merits. Correspondingly, an injunction defendant has a lesser burden to establish his right to recover on an injunction bond than would be required in an ordinary action for malicious prosecution.

The only other cause of action for wrongful injunction is for malicious prosecution. " 'It is established by the weight of authority that in the absence of elements of an action for malicious prosecution no action will lie by the defendant in an injunction suit, independently of a bond or undertaking, for damages for the wrongful suing out of the injunction.' " *Camp v. Atlantic Refining Co.,* 179 S.W.2d 326, 328 (Tex.Civ. App.—Texarkana 1944, writ ref'd). To prevail upon this cause of action the claimant must prove that the injunction suit was prosecuted maliciously and without probable cause, and was terminated in his favor. *See James v. Brown,* 637 S.W.2d 914, 918 (Tex.1982). Once the injunction plaintiff has prevailed after full hearing of all issues, damages to the defendant result not from the reduced showing required to obtain temporary relief but from the full proof necessary to succeed on the merits, and defendant cannot recover those damages without full proof of malicious prosecution.

The damages recoverable in an action on an injunction bond are, of course, limited to the amount of the bond. In an action for malicious prosecution, all actual damages may be recovered. Under either cause of action the claimant must prove that issuance of the injunction caused him damages. He cannot recover for having been prohibited from doing something which he had no right to do. *Parks,* 8 S.W. at 107. Nor can he recover for having been prohibited from doing something which he agreed not to do, even if the agreement was unenforceable. *Wissman v. Boucher,* 150 Tex. 326, 240 S.W.2d 278, 281 (1951).

The temporary restraining order and temporary injunction against DeSantis and RDI were never dissolved. Consequently, under Rule 684, Texas Rules of Civil Procedure, DeSantis and RDI are not entitled to recover against the bond Wackenhut posted for each of these orders. DeSantis and RDI did not request jury findings on their malicious prosecution claim and therefore waived it. Moreover, there is no evidence in this record that Wackenhut acted maliciously and without probable cause in bringing suit, especially inasmuch as the trial court and court of appeals both found merit in Wackenhut's claim. Thus, DeSantis and RDI are not entitled to recover on their claim of malicious prosecution. Accordingly, DeSantis and RDI have failed to establish their right to recover damages against Wackenhut for wrongful injunction.

**B**

DeSantis and RDI claim that the noncompetition agreement between DeSantis and Wackenhut violates the Texas Free Enterprise and Antitrust Act of 1983, Texas Business and Commerce Code Annotated sections 15.01–15.51 (Vernon 1987 and Supp.1990), and that they are therefore entitled to recover treble damages against Wackenhut under that statute. More specifically, DeSantis and RDI assert that the noncompetition agreement is unlawful under section 15.05(a), which declares that "[e]very contract ... in restraint of trade or commerce is unlawful." DeSantis and RDI contend that, under section 15.21(a), they are entitled to recover damages from

Wackenhut as persons "whose business or property has been injured by reason of any conduct declared unlawful" in section 15.-05(a), and that because Wackenhut's conduct was "willful or flagrant", they are entitled to have those damages trebled.

Although we have not previously had occasion to apply state antitrust statutes to noncompetition agreements between employers and employees, we do not write on a clean slate. Section 15.04 instructs:

> The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose.

Section 15.05(a) is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988).[8] Accordingly, we look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law.

As we have noted above, an agreement not to compete is a restraint on trade. However, not every contract in restraint of trade is prohibited by section 1 of the Sherman Act, but only those contracts which unreasonably restrain trade. *E.g., Standard Oil Co. v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *United States v. American Tobacco Co.,* 221 U.S. 106, 179, 31 S.Ct. 632, 648, 55 L.Ed. 663 (1911). The focus of this "rule of reason" test is upon whether the restraint promotes competition or suppresses or destroys competition. *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53

L.Ed.2d 568 (1977); *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Some restraints, because of their inherently pernicious effect upon competition, are per se unreasonable, while others are not and must be analyzed under the rule of reason. *See* 2 J. VON KALINOWSKI, ANTITRUST LAWS AND TRADE REGULATION § 3.02[6] (1989). The factors important to a rule of reason analysis vary from case to case. *See Chicago Bd. of Trade,* 246 U.S. at 238, 38 S.Ct. at 243; D. ASPELUND & C. ERIKSEN, EMPLOYEE NONCOMPETITION LAW § 7.01 (1987) ["ASPELUND"]; W. LIFLAND, STATE ANTITRUST LAW § 4.02 (1987) ["LIFLAND"]; E. ROCKEFELLER, ANTITRUST QUESTIONS AND ANSWERS 16–20 (1974).

Until recently, there were few attempts to apply antitrust law to post-employment noncompetition agreements. *See* ASPELUND, *supra* § 7.01, at 7–1 to 7–4; Blake, *Employee Agreements Not to Compete,* 73 HARV.L.REV. 625, 628 n. 8 (1960) ["Blake"]; White, *"Common Callings" and the Enforcement of Postemployment Covenants in Texas,* 19 ST. MARY'S L.J. 589, 599 (1988); Note, *The Antitrust Implications of Employee Noncompete Agreements: A Labor Market Analysis,* 66 MINN.L.REV. 519, 520 (1982) ["Note"]. There can be little doubt that the Sherman Act applies to such agreements. *See Consultants & Designers, Inc. v. Butler Serv. Group, Inc.,* 720 F.2d 1553, 1564 (11th Cir. 1983); *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 901–903 (9th Cir.1983); *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1082 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Golden v. Kentile Floors, Inc.,* 512 F.2d 838, 843–844 (5th Cir.1975); *Bradford v. New York Times Co.,* 501 F.2d 51, 59 (2nd Cir.1974); ASPELUND, *supra* § 7.01 at 7–8; A. VALIULUS, COVENANTS NOT TO COMPETE: FORMS, TACTICS, AND THE LAW 37 (1985) ["VALIULUS"]. However, it appears that no such noncompetition agreement has ever been held to violate the Sherman Act. *See*

---

8. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...."

*United States v. Empire Gas Corp.*, 537 F.2d 296, 301 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Bradford*, 501 F.2d at 59 (2nd Cir. 1974); *Golden*, 512 F.2d at 843–844 (5th Cir.1975); *Frackowiak v. Farmers Ins. Co.*, 411 F.Supp. 1309, 1315–1316 (D.Kan. 1976); ASPELUND, *supra* § 7.01 at 7–4; Blake, *supra* 628 and n. 8. One explanation for this absence of precedent may be the difficulty involved in proving that a post-employment noncompetition agreement violates the Sherman Act. Such agreements are not per se violations of the Sherman Act but must be analyzed under the rule of reason. *See Consultants*, 720 F.2d at 1560–1562; *Aydin*, 718 F.2d at 900–901; *Golden*, 512 F.2d at 843–844; *Bradford*, 501 F.2d at 59–60; ASPELUND, *supra* § 7.01 at 7–11 to 7–12; *cf. Newburger*, 563 F.2d at 1082 (not ordinarily a per se violation, but might be if served no legitimate purpose when adopted). To establish a violation under the rule of reason, one must prove that the agreement has an adverse effect on competition in the relevant market. *See Consultants*, 720 F.2d at 1562; *Aydin*, 718 F.2d at 902. This is distinguished from the effect a post-employment noncompetition agreement has on the particular employer and employee involved. *See Bradford*, 501 F.2d at 59–60; ASPELUND, *supra* § 7.01 at 7–14 to 7–15; Note, *supra* at 524–525 n. 10.

Rule of reason analysis under antitrust laws must not be confused with reasonableness analysis under the common law. Rule of reason analysis tests the effect of a restraint of trade on *competition.* By contrast, whether a noncompetition agreement is reasonable depends upon its effect on the parties, the *competitors,* as it were. The two standards are not directly related. An agreement may be reasonable as between the parties and nevertheless violate antitrust laws. *See Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (Stevens, J., dissenting). Conversely, an agreement may be unreasonable as between the parties and yet not violate the rule of reason test under the antitrust laws.

Construing section 15.05(a) of our state antitrust law in light of these federal judicial interpretations of section 1 the Sherman Act, as we are instructed to do by statute, we hold that a post-employment noncompetition agreement does not violate section 15.05(a) unless it fails the same rule of reason analysis that would be applied under federal law.[9] The anticompetitive market effect necessary to show such a violation does not appear in this case. DeSantis and RDI offered no evidence of relevant market or anticompetitive effect, and requested no fact findings by the jury on these issues. Accordingly, DeSantis and RDI have failed to establish their right to recover for violations of state antitrust law.

**C**

DeSantis and RDI claim that Wackenhut fraudulently induced DeSantis to sign the noncompetition agreement. More specifically, DeSantis claims that he signed the agreement only because George Wackenhut misrepresented to him that he was being considered for an executive position. The trial court granted a directed verdict for Wackenhut on DeSantis and RDI's fraud claims, which was proper if there was no evidence to support at least one element of the cause of action. The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). The only evidence of fraud at trial consisted of DeSantis' testimony that George Wackenhut told him that he wanted to surround his son with professionals to move the company into the future, that he had been told that DeSantis was one of those professionals,

---

**9.** In view of this holding, we are not required in this case to consider the effect of the recent additions of sections 15.50 and 15.51 to the Texas Business and Commerce Code, see note 8, *supra,* and we do not do so.

that DeSantis would be required to learn the "bread and butter" of the business and then would move to the next stage, and that DeSantis was basically being hired for an executive position. Assuming that George Wackenhut made the statements which DeSantis attributed to him, even though he denied DeSantis' account of their conversation, DeSantis produced no evidence that these statements were false when they were made, or that George Wackenhut knew that they were false when he made them, or that he intended by these statements to induce DeSantis to sign the noncompetition agreement. Inasmuch as DeSantis and RDI failed to produce evidence to support each element of their fraud claim, the court of appeals correctly affirmed the trial court's grant of a directed verdict on that claim.

### D

 DeSantis and RDI claim that Wackenhut's enforcement of the noncompetition agreement tortiously interfered with their contract and business relationships. Wackenhut moved for summary judgment on this claim, based upon an affidavit which was not included in the record on appeal. The trial court granted Wackenhut's motion. To appeal this ruling, DeSantis and RDI had the burden to bring forward the record of the summary judgment hearing to prove harmful error. *Escontrias v. Apodaca*, 629 S.W.2d 697, 699 (Tex.1982). Absent a complete record of the summary judgment evidence, an appellate court must assume that the omitted documents support the judgment of the trial court. *Alexander v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 401 S.W.2d 688, 689 (Tex.Civ.App.—Waco 1966, writ ref'd); *Hassell v. New England Mut. Life Ins. Co.*, 506 S.W.2d 727 (Tex.Civ.App.—Waco 1974, writ ref'd). Without the affidavit, we are unable to review whether Wackenhut conclusively proved that it was entitled to judgment on the tortious interference claim as a matter of law. The court of appeals, therefore, correctly affirmed the trial court's award of summary judgment for Wackenhut on the tortious interference claim.

### V

Inasmuch as we have held the noncompetition agreement in this case to be unreasonable and unenforceable, we reverse the judgment of the court of appeals which affirmed the permanent injunction enforcing that agreement, and vacate that injunction ordered by the trial court. We also reverse the judgment of the court of appeals which affirmed the trial court's judgment awarding Wackenhut attorney fees against DeSantis and RDI. Because we have held that DeSantis and RDI failed to establish their right to recover any damages against Wackenhut, we affirm the judgment of the court of appeals which affirmed the trial court's judgment that DeSantis and RDI take nothing against Wackenhut. Costs in the trial court, the court of appeals, and this Court are taxed against the party which incurred them.

MAUZY, J., files concurring opinion in which SPEARS, J., joins.

MAUZY, Justice, concurring.

The Court takes pains to avoid overruling *Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168 (Tex.1987), and *Bergman v. Norris of Houston*, 734 S.W.2d 673 (Tex. 1987) and I am therefore able to concur in the Court's judgment. However, by even discussing these cases, the Court reaches too far.

In *Hill* and *Bergman*, "[w]e specifically rejected from being enforceable covenants restricting the right to engage in a common calling." *Bergman*, 734 S.W.2d at 674. In the instant case, however, the noncompetition agreement is unenforceable without regard to whether it restricts the right to engage in a common calling. Thus, the Court's discussion of the common calling doctrine is unnecessary, gratuitous and ill-advised. Is this not the very definition of "judicial activism"?

I disagree, too, with the Court's conclusion that "the Legislature has now rejected common calling as a test for the reasonableness of noncompetition agreements." 793 S.W.2d at 683. The statute in ques-

tion, Tex.Bus. & Com.Code § 15.50, effective in 1989, provides in part that "a covenant not to compete is enforceable to the extent that it ... contains reasonable limitations as to time, geographical area, and scope of activity to be restrained." The "scope of activity" language, in my view, leaves adequate room for the continued vitality of the common calling doctrine. In any case, this is not a question the Court needs to decide today.

Finally, I must make two comments regarding the Court's complaint that we have not previously provided a comprehensive definition of "common calling". First, reasonably precise definitions *have* been formulated. *See e.g.,* C.L. Ray & M. McKelvey, *Drafting Enforceable Noncompetition Agreements in Texas*, 20 Tex.Tech L.Rev. 63, 68 (1989); W. White, *Common Callings and the Enforcement of Postemployment Covenants in Texas*, 19 St. Mary's L.J. 589, 611 (1988). Second, it is the genius of the common law that it evolves slowly in the light of reason and experience. I am content to allow the common calling concept to be worked out on a case-by-case basis.

SPEARS, J., joins in this concurring opinion.