**METROPOLITAN LIFE INSURANCE COMPANY, Brantly Minor, III, Fred Arnholt, and Penny L. Parker, Substitute Trustee, Appellants,**

v.

**LA MANSION HOTELS & RESORTS, LTD., LDN, Ltd., and Patrick J. Kennedy, Sr., Appellees.**

No. 04–88–00154–CV.

Court of Appeals of Texas, San Antonio.

Nov. 9, 1988.

Rehearing Denied Jan. 5, 1989.

Seagal V. Wheatley, Craig A. Stokes, Donald R. Philbin, Jr., Oppenheimer, Rosenberg, Kelleher & Wheatley, Inc., San Antonio, for appellants.

R. Laurence Macon, G. Wade Caldwell, Cox & Smith, San Antonio, for appellees.

Before CADENA, C.J., and BUTTS and DIAL, JJ.

## OPINION

CADENA, Chief Justice.

Defendants, Metropolitan Life Insurance Company (Met), Brantly Minor, III, Fred Arnholt and Penny L. Parker, substitute trustee, appeal from an order temporarily enjoining a trustee's sale of the La Mansion del Norte Hotel (del Norte) located in San Antonio. Plaintiffs are La Mansion Hotels & Resorts, Ltd. (LMHR), LDN, Ltd., and Patrick J. Kennedy, Sr.

MetHotels, Inc., and Doubletree, Inc., wholly-owned subsidiaries of Met, while named as defendants, are not parties to this appeal.

At the outset, we reject defendants' contention that the trial court erred in failing to file findings of fact and conclusions of law. Where the appeal is from an order granting a temporary injunction, no findings of fact and conclusions of law need be filed. TEX.R.APP.P. 42(a)(1); *Loomis International, Inc. v. Rathburn*, 698 S.W.2d 465, 467 (Tex.App.—Corpus Christi 1985, no writ).

Met is the beneficiary under a deed of trust securing a note which represents money lent by Met for the construction of del Norte. Defendant Parker is the substitute trustee under the deed of trust, while defendants Arnholt and Minor are two employees of Met. Plaintiff Kennedy is the founder of the La Mansion hotel chain; LDN is the current owner of del Norte and principal debtor under the loan documents; and LMHR is the management company which currently operates del Norte. Kennedy is the limited partner in and owns 99% of LDN and LMHR.

Plaintiffs have alleged numerous causes of action against all defendants, including MetHotels and Doubletree, the non-appealing defendants. These allegations include duress, fraud, breach of fiduciary duty, breach of duty of good faith and fair dealing, tortious interference with plaintiffs' contracts and business relationships, civil conspiracy and violation of the Deceptive Trade Practices Act. Since plaintiffs are entitled to injunctive relief if issuance of the injunction is proper under any one of these theories, our discussion will be limited to the evidence concerning the civil conspiracy claim. Insofar as del Norte is concerned, plaintiffs alleged that MetHotels, Doubletree, Arnholt and Minor conspired to interfere with plaintiff LMHR's management contracts and to cause LDN and LMHR to be in danger of losing ownership and management of del Norte.

The only question before the trial court in a temporary injunction case is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial of the case on its merits. *Transport Company of Texas v. Robertson Transports, Inc.*, 152 Tex. 551, 261 S.W.2d 549, 552 (1953). When the pleadings and the evidence support a finding of probable right and probable injury, an order granting a temporary injunction will not be disturbed on appeal. *See Davis v. Huey*, 571 S.W.2d 859 (Tex. 1978). In reviewing such an order we will draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *Mendoza v. Canizales*, 695 S.W.2d 266, 270 (Tex.App.—San Antonio 1985, no writ).

The La Mansion hotel chain consisted of three hotels owned and managed by Kennedy. La Mansion del Rio, in downtown San Antonio was opened in 1968 by a group of investors headed by Kennedy, who took over management in 1970. He constructed and began to operate del Norte in the northern part of San Antonio in 1978. The third La Mansion Hotel was opened in 1981 in Austin.

Kennedy obtained permanent financing for del Norte from Met in 1978. The loan was refinanced with Met in 1981 to increase the principal amount to $11,250,-000.00. Kennedy executed a promissory note, payable to Met, which was secured by a deed of trust and security agreement. He also guaranteed payment of the note in an amount up to $1,300,000.00. At the time of such refinancing, Kennedy was unaware of the fact that Met was in the

process of acquiring a 20% interest in Doubletree, which was actively engaged in the hotel business. Kennedy said he would not have executed the 1981 refinancing documents had he known of Met's purchase of an interest in Doubletree.

The business of La Mansion hotel flourished until 1985, when Kennedy began experiencing financial difficulties. In 1986, Kennedy hired a real estate investment consultant who was to find persons who would invest in the hotels while agreeing to retain LMHR as the management company. The retention of management rights was essential to enable and to insure the continued viability and growth of the hotel chain. The efforts to locate investors bore no fruit.

In the summer of 1986, Kennedy formulated a plan to restructure the debt of all three hotels. This plan required the cooperation of several lenders. In order to realize over one million dollars in tax benefits, the restructuring had to be accomplished no later than December 31, 1986.

In furtherance of his plan, Kennedy, still ignorant of Met's ownership interest in Doubletree, first met with Met representatives, including Arnholt and Minor, in November, 1986, when he laid out the complete financial picture of all three hotels. Met's initial reaction was positive.

Immediately after this meeting Arnholt told James Schmidt, president of Doubletree, of the negotiations with Kennedy. Schmidt's memorandum of this conversation with Arnholt recites: "[Arnholt] is playing hardball, even though [Kennedy] is a 'nice guy.' Possibility of foreclosure. We would be interested in taking over immediately."

At about this time rumors began to circulate that a Doubletree takeover of del Norte was imminent. These rumors, said Kennedy, caused a "tremendous disruption of employee morale and business" at del Norte and had a "devastating impact" on the operation of the hotel into 1987.

On December 15, 1986, Kennedy met with Mary Beth Kayle, a Met employee, who indicated that there would be no problem with Kennedy's continued management of del Norte. She suggested a "cash flow mortgage" as a means of helping Kennedy. Under this proposal, Kennedy would pay the net cash flow from del Norte or a fixed minimum payment, whichever was greater. The next day Kennedy submitted a plan for a cash flow mortgage.

Met purchased the remaining 80% interest in MetHotels and Doubletree on December 18, 1986. On December 19, 1986, Minor told Kennedy by telephone that Met rejected the cash flow mortgage proposal and would make no counter-proposal. Kennedy testified that with only eleven days left until his December 31 deadline, this rejection threatened the entire restructuring plan for the three hotels. According to him, his only alternative was bankruptcy.

On the following Monday, December 22, Kennedy and his financial consultant met with Arnholt and Minor in Houston. By this time Kennedy had learned, from the newspapers, of Met's purchase of MetHotels and Doubletree. During this adversarial meeting Arnholt expressed pleasure over the existence of Kennedy's personal guarantee because Met could pursue him in the event of a deficiency at foreclosure. However, the evidence supports the conclusion that Kennedy's equity in del Norte exceeded the amount of the debt by 3 or 4 million dollars so that there would be no deficiency. Arnholt also threatened to terminate LMHR's management contract and substitute Doubletree as manager of del Norte.

As Arnholt was leaving the meeting he outlined what Met "might do if they would do anything." According to Kennedy, since only nine days were left in 1986, he had no choice other than to accept this proposal, which became the first of two new agreements signed by the parties.

The first agreement, executed on December 31, 1986, provides that Met would forebear from posting del Norte for foreclosure for six months if Kennedy complied with the terms of this agreement. This agreement recites that Met had accelerated the note because of Kennedy's failure to make the payments due in October, November

and December, 1986. Plaintiffs insist that no default had occurred because Met had agreed not to insist on such payments, and that they were coerced into accepting the default language because of the necessity of resolving the restructuring plan by December 31, 1986. This agreement reduced LMHR's management fee and, according to Kennedy, contained oppressive reporting requirements. According to the agreement, the parties contemplated that at the end of six months the note would have been brought to a current status and the original terms of the note would be reinstated. The purpose of this agreement was to provide additional time for Kennedy to seek an investor for del Norte.

Meanwhile, Arnholt continued to keep Doubletree's management informed of the negotiations with Kennedy. A memorandum from Peter Bidstrup, Doubletree's chief executive officer, to Schmidt relates that on December 22 Bidstrup indicated that there was a high probability that Met would acquire del Norte, but that the acquisition would not occur until July rather than February. An Arnholt memorandum of the same date reflects that he promised to keep Schmidt informed concerning a possible foreclosure by Met. A memorandum from Schmidt detailing a January 5, 1986, conversation with Arnholt states: "They've worked out a 'program' wherein they may get [del Norte] on July 1. Meanwhile, owners will try to sell it for sure. Could be sold. Maybe not. Could be bankruptcy threat. But Met can maneuver around that and foreclose, July 1 at the earliest."

During this time del Norte employees continued to be "barraged" with telephone calls and statements that Doubletree was taking over and that their jobs were in jeopardy.

Although he had complied with the December 31, 1986, agreement, Kennedy wrote to Arnholt on May 11, 1987, seeking an extension of the agreement. Kennedy claims that he was coerced into accepting the terms of the new agreement, executed on July 10, 1987, in order to maintain the pressure on him. This agreement, like the first agreement, was for a six-month term,

recited that the note and the first agreement were in default, and provided for minimum payments each month. In addition, it excluded the possibility of additional extensions. Kennedy denied that a default existed.

In October, 1986, Kennedy located an investor who was willing to contribute $1,500,000.00 in cash, which would bring the note current, in return for an interest in del Norte. Met knew this potential investor because he owned the Hyatt Regency Hotel, in San Antonio, on which Met had a loan. Nevertheless, Met refused to meet with Kennedy and representatives of this potential investor, although fruitless discussions regarding this proposal continued through December, 1987.

Plaintiffs failed to make the December 1, 1987, payment of $61,000.00 required by the last agreement. On November 30, 1987, Kennedy asked if he could use left over escrow funds, plus additional sums, to make the payment. The money in the escrow fund, which had been accumulated for capital reserves in 1987, totaled $48,000.00 and, according to Kennedy, would not be used in 1987. Met, acting through Minor, rejected this proposal and at a December 2 meeting scheduled to discuss the proposal, Minor declared that Kennedy was in default and that Met would accept no further payments. By this time, Kennedy claimed to have the necessary funds available for the payment without using the escrow funds, but discussions with Met representatives made it clear to him that the payment, even if tendered, would be rejected.

Two additional Doubletree memoranda, dated in November and December, 1987, indicate that communications between Arnholt and Schmidt concerning the del Norte situation were continuing. According to the memorandum dated November 25, 1987:

The [del Norte] 'foreclosure program' is over in December ... and [Arnholt is] 90% sure that [Kennedy will] be involved in a foreclosure there. Thus, that one will be hung up for a long while. Maybe he could shake it loose by the middle of 1988 for us, but probably not.

In the second memorandum dated December 17, 1987, Schmidt indicates that he checked with Arnholt about the possibility of "any additional conversions in 1988," and that Arnholt told him that del Norte had defaulted and that there was a "partial guarantee." The memorandum recited that if Arnholt was able to work with the owners on a "quick release" or a negotiated settlement on the personal guarantee, "it could be over quickly," otherwise it could take years. According to this memorandum, Arnholt would know "in a couple of weeks whether or not it'll be a fight."

On December 31, 1987, the July 10, 1987, agreement expired. Under its provisions, plaintiffs were required to enter into a reinstatement agreement to comply with the terms of the original note, including the payment of all delinquent interest, expenses and unpaid principal, or pay the note in full plus a 5% prepayment fee. Neither condition was met.

On January 8, 1988, Met posted a notice setting the foreclosure sale for February 2, 1988. Appellees then filed this suit and obtained a temporary restraining order on February 1, halting the sale. On March 1, 1988, the temporary injunction of which defendants now complain was granted, with the bond set at $400,000.00.

■ Defendants incorrectly contend that because the non-appealing defendants are not restrained by the temporary injunction, "no claims against those defendants [MetHotels and Doubletree] can [be] the basis for the issuance of the Temporary Injunction." We do not agree that the actions of such defendants are irrelevant. MetHotels and Doubletree are not beneficiaries under the deed of trust and, consequently, were powerless to seek foreclosure even in the absence of any injunction. To enjoin them from doing that which they are powerless to accomplish would be an exercise in futility. Plaintiffs claimed that MetHotels and Doubletree, along with the appealing defendants, joined in a conspiracy against plaintiff. The fact that, as a practical matter, there is no need for an injunction against MetHotels and Doubletree does not mean that their conduct cannot be considered in determining whether plaintiffs have shown a probable right and probable injury sufficient to support temporary injunctive relief.

■ Defendants' argument that Kennedy and LMHR have no standing to prevent foreclosure because they are not owners of del Norte must be rejected. We do not agree that LDN is the only owner of the property. Defendants acknowledge that Kennedy is "an owner (i.e., holding a 99% interest in) the other [plaintiffs], LDN and LMHR." The evidence leaves no doubt that Kennedy controlled both the limited partnerships that were created to own and manage the hotels and that LMHR has a contractual right to manage del Norte. There is no dispute concerning Kennedy's authority to act on behalf of the partnerships. It is unnecessary to attempt to distinguish between the partnership that owned or managed the hotel and the owner of that partnership.

Defendants assail plaintiffs' conspiracy theories on the ground that there is no showing of the existence of a combination of two or more persons, and that in the absence of such a showing there is no evidence showing the existence of a conspiracy. Their assertion of the failure to show a combination of two or more persons is based on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). We do not regard *Copperweld* as controlling, or even persuasive, here. That case involved the meaning of conspiracy under section 1 of the Sherman Act, 15 U.S.C.A. sec. 1 (1973). In holding that there had been no violation of the statute, the United States Supreme Court held that the coordinated activity of a corporation and its wholly-owned subsidiary must be viewed as the conduct of a single entity for the purposes of sec. 1 of the Sherman Act. 467 U.S. at 771, 104 S.Ct. at 2741–42, 81 L.Ed.2d at 643. For some reason, the Court pointed out that a parent and its wholly-owned subsidiary always have a unity of purpose or a common design. Unity of purpose or a common design is, of course, characteristic of any conspiracy and cannot be seriously con-

sidered as indicating the lack of a combination. In any event, the holding was that the two entities are incapable of conspiring with each other for the purposes of the Sherman Act. 467 U.S. at 777, 104 S.Ct. at 2744–45, 81 L.Ed.2d at 647.

Defendants, of course, argue that MetHotels and Doubletree, as wholly-owned subsidiaries of Met, cannot be guilty of conspiring with their parent company.

■ In *Copperweld* the Supreme Court limited its holding to cases involving alleged violations of the Sherman Act. 467 U.S. at 767, 104 S.Ct. at 2739, 81 L.Ed.2d at 640–41. Since we are not here dealing with an alleged violation of the Sherman Act, the holding concerning the meaning of that statute is irrelevant. We are here concerned with an alleged conspiracy under common law theories. Under the common law, a parent corporation and its subsidiary are separate legal entities. "Notwithstanding the fact that a parent corporation owns the entire capital stock of the subsidiary corporation, the two corporations are separate legal entities, and, whatever may have been the motive leading to their separate existence, they can only be regarded as separate entities for the purpose of legal proceedings." *Rimes v. Club Corporation of America*, 542 S.W.2d 909 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.).

■ It is significant that the alleged conspiracy began at least a month before Met acquired full control of MetHotels and Doubletree. The Schmidt memorandum of November 11, 1986, indicates that Arnholt and Schmidt were discussing the takeover of del Norte before Met purchased the remaining 80% of Doubletree on December 18, 1986. Although the trial court remarked that it was being "received for Doubletree," there is in evidence another memorandum by Arnholt, dated December 22, 1986, which, while detailing a December 22 meeting between Arnholt and Bidstrup, mentions a letter from Schmidt, dated December 17, 1986, referring to the proposed foreclosure by Met in February, 1987. In this memorandum, we find reference to a request by Arnholt that Bidstrup inform Schmidt of the possibility of an agreement between Met and Kennedy which would preclude the proposed February foreclosure. The memorandum contains an assurance by Arnholt that he would keep Doubletree informed if and when a foreclosure would occur. Taken as a whole, the memorandum indicates an ongoing series of communications between Arnholt and Doubletree management regarding a possible foreclosure on del Norte by Met. The memorandum further establishes that at least part of this ongoing furnishing of information by Arnholt to Doubletree took place prior to December 18, the day on which Met acquired complete control of MetHotels and Doubletree.

Plaintiffs have made a sufficient showing of a probable right to justify the issuance of the temporary injunction.

■ Defendants assert that plaintiffs failed to show probable injury which would flow from the denial of injunctive relief because they have an adequate remedy at law. They insist that plaintiffs' claims are based either on a common law tort or a statutory claim for which Texas law provides an adequate remedy by way of damages.

Foreclosure of Met's lien in this case would, of necessity, result in the loss of plaintiffs' real property. Every piece of real property is considered unique. *Greater Houston Bank v. Conte*, 641 S.W.2d 407, 410 (Tex.App.—Houston [14th Dist.] 1982, no writ). This doctrine coupled with the fact that there is evidence to support findings that (1) foreclosure would result in the loss of a substantial equity in the property; (2) the value of the property is substantially in excess of the debt owed; and (3) valuable improvements have been made on the property furnish a sufficient basis for the conclusion that plaintiffs have shown the probability of irreparable injury. *See Home Savings of America, F.A. v. Van Cleave Development Co., Inc.*, 737 S.W.2d 58, 59 (Tex.App.—San Antonio 1987, no writ).

■ The fact that plaintiffs have failed to tender the full amount due on the note and have not demonstrated their ability to

pay such amount is irrelevant under the facts of this case. In *Home Savings of America, F.A. v. Van Cleave Development Co., Inc., supra,* this Court held that where the evidence shows that the lender has engaged in inequitable actions which adversely affect the ability of the debtor to pay tender it is unnecessary to establish the right of the property owner to preservation of the status quo. 737 S.W.2d at 60. In this case there is evidence that Arnholt informed Doubletree of the possibility of foreclosure and that the plan was to deliver del Norte to Doubletree. This plan and maintenance of communications, plus the rumors that Doubletree would take over management of the hotel had a disastrous effect on plaintiffs' operations. The evidence supports the conclusion that Met, by refusing to negotiate with the potential investor which Kennedy had found in October, 1987, contributed to a situation which adversely affected plaintiffs' ability to perform their obligations. Under these circumstances, the trial court could reasonably conclude that tender of the amount due was not required.

In support of their contention that the amount of bond set by the trial court ($400,000.00) is insufficient and should be increased, defendants point out that Met had lost $1,300,000.00 in uncollected interest and that additional interest was accumulating at the rate of $120,000.00 per month.

■ The amount of a temporary injunction bond need not be equal to interest which will accrue while the injunction remains in force. *El Paso Development Co. v. Berryman,* 729 S.W.2d 883, 889 (Tex. App.—Corpus Christi 1987, no writ). Nor must the amount of the bond equal the value of the property concerning which foreclosure is sought. *Home Savings of America, F.A. v. Van Cleave Development Co., Inc.,* 737 S.W.2d at 61.

■ Defendants' argument that they have lost uncollected interest is not persuasive, since interest on the note continues to accrue during the period that the injunction remains in force. The temporary injunction in no way interrupts the accrual of interest, nor does it relieve plaintiffs of the obligation to pay interest. *El Paso Development Co. v. Berryman,* 729 S.W.2d at 888; *Kaspar v. Keller,* 466 S.W. 2d 326, 328 (Tex.Civ.App.—Waco 1971, writ ref'd n.r.e.). The trial court did not act unreasonably in setting the amount of the bond at $400,000.00.

The order granting the temporary injunction is affirmed.