**ICHIBAN RECORDS, INC., Appellant,**

v.

**RAP–A–LOT RECORDS, INC. and N–The–Water, Inc., Appellees,**

**and**

**Willie J. DENNIS p/k/a Willie D., Will Entertain, Inc. d/b/a Wize Up Records, Appellants**

v.

**RAP–A–LOT RECORDS, INC. and N–The–Water, Inc., Appellees.**

**Nos. 01–94–01235–CV, 01–95–00085–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 29, 1996.

Rehearing Overruled July 9, 1996.

---

Michael T. Wall, Mary Jo Cantu, Houston, for appellant.

Steven M. Zager, Joe Michels, Gregory S. Coleman, Robert W. Higgason, Weil, Gotshal & Manges, Houston, for Will J. Dennis and Will Entertain, Inc.

Jennifer B. Hogan, Robert Hoffman, Christina H. Patierno, Terriann Trostle, Houston, for appellees.

Before OLIVER–PARROTT, C.J., and O'CONNOR and TAFT, JJ.

## MAJORITY OPINION ON MOTION FOR REHEARING.

OLIVER–PARROTT, Chief Justice.

Appellant, Ichiban Records, Inc. (Ichiban) and appellees, Rap–A–Lot Records, Inc. (RAL) and N–The–Water, Inc. have filed motions for rehearing. We grant Ichiban's motion for rehearing and overrule RAL's and N–The–Water, Inc.'s motion for rehearing.

In this appeal, we determine whether the trial court abused its discretion in granting a temporary injunction to RAL and N–The–Water, Inc., restraining appellants, Willie J. Dennis p/k/a Willie D. (Dennis), Will Entertain, Inc. d/b/a Wize Up Records (Wize),[1] and Ichiban from engaging in conduct prohibited by the exclusive recording agreement Dennis

---

1. For convenience Dennis and Wize will be referred to as "Dennis."

signed with RAL. We find that it did and reverse and remand.

## Procedural History

On October 19, 1994, the trial court held the hearing on RAL's application for temporary injunction. On November 15, 1994, the trial court signed an order enjoining Dennis and Ichiban from violating the terms of RAL's exclusive recording agreement. To appeal the November 15 order, on December 5, 1995, Ichiban filed its cash deposit in lieu of appeal bond, resulting in the creation of appeal number 01–94–01235–CV. On December 7, 1994, the trial court signed an agreed order modifying the November 15 order. On December 28, 1994, the trial court signed an amended order that superseded the November 15 and December 7 orders. On that date, Dennis filed a cost bond on appeal, which stated that it was given for appeal of the November 15 order. This resulted in the creation of appeal number 01–95–00085–CV. Then, on January 10, 1995, Dennis filed the cost bond to appeal the December 28th order, again in appeal number 01–95–00085–CV.

## RAL's Motion to Dismiss

■ RAL contends that Dennis's appeal should be dismissed because it was not timely filed. It relies on Tex.R.App.P. 42(a)(3), which provides that in all accelerated appeals from interlocutory orders the bond shall be made within 20 days after the order appealed from is signed. RAL argues that Dennis did not file the cost bond appealing the November 15 order within the prescribed 20 days.[2] RAL also cites Tex.R.App.P. 43(f), which provides that when an appeal is pending from an interlocutory order, any further appealable interlocutory order of the trial court concerning the same subject-matter may be brought before the appellate court for review on motion. Tex.R.App.P. 43(f). RAL argues that rule 43(f) permits subsequent orders to be brought before the Court for appellate review only in the proceeding appealing the initial order. RAL's inference then, is that since Dennis' appeal of the initial order was untimely, his appeal of the December 28

order within that same appeal was of no effect.

We agree with RAL that Dennis's cost bond to appeal the November 15 order was untimely because it was filed more than 20 days after the order. Tex.R.App.P. 42(a)(3). It was therefore of no effect. Dennis' cost bond filed January 10, 1995, to appeal the December 28, 1994, order was timely, however, having been filed within 20 days of the December 28 order. Because Dennis's filing of the cost bond appealing the November 15 order was untimely, rule 43(f) does not apply to this case. *See Currie v. International Telecharge, Inc.* 722 S.W.2d 471, 473 (Tex. App.—Dallas 1986, no writ) (court held that it had jurisdiction to review an order superseding an original injunctive order despite the fact that appellants had not appealed the original injunctive order). Accordingly, we overrule RAL's motion to dismiss.

We now address the appeal on the merits.

## Factual Background

At age 21, Dennis, an aspiring rap artist, desired to start a solo career. On October 15, 1988, he signed an exclusive recording agreement with RAL, the same recording company with which the rap group Ghetto Boys had signed. He also signed an exclusive songwriting agreement with N–The–Water, Inc. RAL and N–The–Water, Inc. were companies owned by James A. Smith. Smith was Dennis's managing agent, who also received 20 percent of whatever compensation Dennis received. Initially, Dennis performed with the Ghetto Boys, but later started working as a solo performer.

The terms of the recording agreement specified that during the term of the agreement, Dennis would:

(1) exclusively render his services as a performing artist for the purpose of making masters [3] for [RAL] and ... deliver the master to [RAL];

(2) not authorize or permit any person ... other than [RAL] to use [Dennis's] legal or professional name or [his] likeness in con-

---

**2.** Dennis' cost bond, filed December 28, was filed 43 days after the signing of the November 15 order.

**3.** A master is a recording from which CDs and other recordings are made.

nection with the advertising or sale of Phonograph Records or blank recording tape or tape recording equipment;

(3) not enter into any agreement which [sic] would interfere with the full and prompt performance of [his] obligations ... and not perform or render any services for the purpose of making, promoting or marketing Phonograph Records or Master Recordings for any person other than [RAL];

(4) not authorize or knowingly permit [his] performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording for making, promoting or marketing Master Recordings or Phonograph Records without [RAL's] express written consent.

Under the agreement, RAL was to pay the recording costs of the masters recorded at recording sessions conducted in accordance with the terms of the agreement in an amount not to exceed a recording budget approved in writing by RAL.

The term of the agreement commenced upon its execution by Dennis. The agreement provided that its term would run for a first contract period, ending nine months after Dennis' completion of an album. It also provided that, at RAL's option, during the first contract period, Dennis would deliver one additional album to RAL. It further provided that Dennis granted RAL nine separate options to extend the contract nine additional contract periods and that each such option should be deemed to be exercised by RAL, to commence immediately upon the expiration of the current contract period, unless RAL gave Dennis notice to the contrary at least 10 days prior to the expiration of the current Contract Period.

Bruce Toval of RAL testified that under the recording contract, for each option period, Dennis is required to deliver one album; that after that, *if* RAL exercises its option,

Dennis is required to deliver another album. He testified that from the start of the contract October 15, 1988, to the time of the hearing on October 19, 1994, Dennis had provided RAL two masters, and that, as far as he was concerned, the contract was still in effect. Toval testified that RAL had spent more than $1,000,000 promoting Dennis's solo career, that he guessed in 1993 Dennis's compensation under the contract was over $100,000, and that over the life of the contract, Dennis had made $500,000.

Toval testified that it first came to RAL's attention sometime in 1993 that Dennis had appeared on the "Sho" album, released by Wize and distributed by Ichiban. He testified that RAL then wrote Ichiban and Dennis and his representative to let him know that he had breached the contract.[4] Ichiban did not respond to RAL's letter, but Dennis's attorney and RAL's attorney unsuccessfully attempted to negotiate a settlement. A week before the October 19 temporary injunction hearing, RAL became aware that Dennis would on October 25, release another CD, "Play Witcha Mama" ("Play"), in his own name. Accordingly, RAL filed suit on October 12, 1994, seeking a temporary injunction prohibiting Dennis and Ichiban from making and distributing unauthorized recordings and performances.

Toval testified that RAL has contracts with Virgin Records (Virgin) to distribute their performers' music, and that if Dennis released his "Play" album on October 25 through an unauthorized distribution company, RAL's reputation would be hurt with Virgin and with new artists it tries to recruit. He also testified that for Dennis to record outside RAL could cause problems with sample clearances.[5]

Dennis testified about the deterioration of his relationship with RAL. He testified that RAL refused to pay him money he was owed every accounting period, refused to advance

---

4. The record reflects that RAL sent Ichiban and Dennis a letter January 31, 1994, calling their attention to contract violations in connection with the unauthorized release of the "Sho" album and threatening to go to court to enforce the contract if Ichiban and Dennis did not respond. On April 6, counsel for RAL wrote Dennis to say that if their differences could not be

settled by April 15, 1994, it would "move forward as it deems necessary."

5. Sampling is a process of using someone else's background music and recording new, different sounds with it.

recording costs to him so that he had to pay the recording costs on his RAL album "Going Out Like a Soldier," refused to give him accounting statements, and sent employees to a club where he was working to threaten him with violence. Dennis testified that he gave RAL written notice by certified mail of their breaches of the contract. He testified that he felt like he could make the "Play" album because in January 1994, RAL sent his lawyers a letter saying RAL was going to file suit to enforce the recording contract, and when April 15 came and went, he believed the contract was null and void.

On cross-examination, Dennis testified that Smith showed an interest in Dennis's career, worked in the studio with him, helped him with his music, and provided him with guidance and direction.

Howard Spalding, Dennis's new business manager, testified that to promote the "Play" album there was an ad campaign in the music publications; that recording, producing, and distribution costs in the amount of $750,000 had been incurred by Ichiban in connection with the album; and that pulling the album would result in lost sales of approximately $1,000,000.

Ichiban, which appeared through counsel only, presented no evidence.

### The Order

In its December 28, 1994, order, the trial court found:

(1) RAL has a valid and enforceable exclusive recording services agreement with Dennis;

(2) Under its terms, the agreement had not expired;

(3) Dennis and Ichiban have violated the terms of the agreement and intend to continue violating its terms by providing Dennis' services to parties other than RAL, such as was done with the "Sho" and "Play Witcha Mama" albums;

(4) If Dennis and Ichiban carry out their intentions, they will alter the status quo, tend to make ineffective a judgment in favor of RAL and cause irreparable harm to RAL;

(5) Unless Dennis and Ichiban are deterred from carrying out their intentions, RAL will be without an adequate remedy at law in that such action will cause them the following irreparable harm:

(a) RAL's relationships with its distributor, Virgin Records, will be harmed because RAL is under contract with Virgin Records to exclusively distribute Dennis' albums;

(b) RAL's relationship with its other artists will be harmed because artists under contract will be encouraged to record and distribute their works with companies other than RAL;

(c) RAL's reputation in the music industry will be damaged;

(d) RAL will be harmed by not being able to market and promote its exclusive artists, including Dennis;

(e) RAL's relationships with third parties who provide "samples" to RAL artists will be harmed;

(f) RAL will be harmed in that its own market to sell product will be destroyed for which RAL paid substantial sums; and

(g) RAL will be harmed by numerous and conflicting copyright claims which surface from Dennis' use of copyrighted material owned exclusively by RAL.

In the order, the trial court ordered all parties to comply with the contract. It found that the "Play" album was already in the stream of commerce; authorized Dennis to produce, market, and sell the "Sho" and "Play" albums; ordered Ichiban to collect all monies related to the sale or other exploitation of the two albums; and ordered that the money be deposited into the court's registry, less reasonable expenses. The trial court denied injunctive relief based on the songwriting agreement because its term had expired. The court set the case for trial on the merits.

### Standard of Review

■ At a hearing on the request for a temporary injunction, the only question before the trial court is whether the applicant is entitled to the preservation of the status quo of the subject matter of the suit pending trial

on the merits. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978).

■ Because an appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order, the merits of the applicant's case are not presented for appellate review; appellate review, therefore, is limited strictly to whether there has been a clear abuse of discretion in granting or denying the temporary injunction. *Davis,* 571 S.W.2d at 861–62; *Swanson Broadcasting, Inc. v. Clear Channel Communications, Inc.,* 752 S.W.2d 165, 168 (Tex. App.—San Antonio 1988, writ dism'd by agr.); *Philip Bros. Inc. v. Oil Country Specialists, Ltd.,* 709 S.W.2d 262, 265 (Tex. App.—Houston [1st Dist.] 1986, writ dism'd). The appellate court is not to substitute its judgment for that of the trial court, but must only determine whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion. *University of Tex. Medical Sch. v. Than,* 834 S.W.2d 425, 429 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Henderson v. KRTS, Inc.* 822 S.W.2d 769, 773 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Philip Bros.,* 709 S.W.2d at 265. In reviewing an order granting or denying a temporary injunction, the appellate court draws all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *Valenzuela v. Aquino,* 763 S.W.2d 43, 44 (Tex.App.—Corpus Christi 1988, no writ); *Metropolitan Life Ins. Co. v. La Mansion Hotels & Resorts, Ltd.,* 762 S.W.2d 646, 648 (Tex.App.—San Antonio 1988, writ dism'd). There is no abuse of discretion if the trial court based its decision on conflicting evidence. *Henderson,* 822 S.W.2d at 773; *Lamar Builders, Inc. v. Guardian Sav. & Loan Ass'n,* 789 S.W.2d 373, 375–76 (Tex.App.—Houston [1st Dist.] 1990, no writ).

■ The trial court abuses its discretion when it misapplies the law to the established facts or when the evidence does not reasonably support the findings of probable right of recovery. *State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.1975); *City of San Antonio v. Bee–Jay Enter., Inc.,* 626 S.W.2d 802, 804 (Tex.App.—San Antonio 1981, no writ).

### Dennis's and Ichiban's First Point of Error—Probable Right to Recover— Law on Enforceability of Contract

■ In their first points of error, Dennis and Ichiban assert that the trial court abused its discretion in holding that RAL had a probable right to recover following a trial on the merits.

In their initial briefs, Dennis and Ichiban contend that restrictive provisions in the recording contract are unenforceable because they constitute covenants not to compete that do not contain reasonable limitations on their duration or geographic scope, citing *DeSantis*[6] and other cases. RAL counters that the covenant not to compete cases do not apply here because they deal with restrictions on the parties to the contract meant to take effect after the term of the contract and that, in this case, the term of the contract has not ended. In his reply brief, Dennis alternatively asserts that the enforceability of the contract should be determined by cases dealing with employment contracts when the term of the contract is indefinite or within the discretion of one or both the parties.

■ We agree with RAL that the restrictive terms in the contract in this case are more like a negative restriction in a personal services contract than a covenant not to compete, because under the wording of the contract, they are intended to operate during the term of the contract and not afterward as is generally the case with covenants not to compete.[7] We also agree with Dennis, how-

---

6. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 682 (Tex.1990).

7. *See Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir.1991) (employee was to refrain from competing with Dun & Bradstreet for one year after he terminated his employment); *DeSantis,* 793 S.W.2d at 676 (Wackenhut sued DeSantis for breaching the portion of their agree-

ment that he would not compete with Wackenhut for two years after his employment ceased); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 661 (Tex.1990) (contract in question contained a covenant not to compete that restrained the promisor from competing with the promisee for two years after the conclusion of the contract); *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168, 170 (Tex.1987) (upon ter-

ever, that the contract in this case is distinguishable from the personal services contract cases cited by RAL in that its term has no time limitation.[8] Thus, we agree with Dennis's alternative argument that the enforceability of the contract should be determined by cases dealing with employment contracts without a definite term. In such cases, the contract is terminable at will by either party. *Hussong v. Schwan's Sales Enter., Inc.,* 896 S.W.2d 320, 324 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Webber v. M.W. Kellogg Co.,* 720 S.W.2d 124, 127 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (quoting *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888)).[9]

Dennis also asserts that because RAL could terminate the contract anytime without cause, it became a contract for employment at will. We agree. *East Line & R.R.R. Co.,* 10 S.W. at 102; *Hussong,* 896 S.W.2d at 324; *Webber,* 720 S.W.2d at 127 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). For that reason alone, RAL did not establish a probable right to recover injunctive relief.

We conclude that the trial court abused its discretion because it found RAL had a probable right to recover. Accordingly, to the extent that Dennis' and Ichiban's first points of error are based on their complaint that the trial court decided RAL had established a probable right to recover, we sustain their first points of error, vacate the temporary injunction order, and remand this case to the trial court.

TAFT, J., dissents.

mination of the agreement, Hill was to refrain from competing with Hill Mobile Auto Trim, Inc.); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 657 (Tex.App.—Dallas 1992, no writ) (Zep sued Harthcock for breach of a covenant not to compete after he terminated his employment with Zep).

**8.** In each of the contracts for personal services containing a negative covenant the term of the contract was for a specific period of time. *See, e.g., Washington Capitols Basketball Club, Inc. v. Barry,* 419 F.2d 472 (9th Cir.1969) (three years); *Houston Oilers, Inc. v. Neely,* 361 F.2d 36 (10th Cir.1966) (four years); *Arias v. Solis,* 754 F.Supp. 290 (E.D.N.Y.1991) (two years); *MCA Records, Inc. v. Newton–John,* 90 Cal.App.3d 18, 153 Cal.Rptr. 153 (2nd Dist.1979) (five years); *King Records, Inc. v. Brown,* 21 A.D.2d 593, 252 N.Y.S.2d 988 (1964) (five years); *Mission I.S.D.*

TAFT, Justice, dissenting.

I respectfully dissent.

The majority reverses the trial court's order that temporarily enforced against Dennis and Ichiban the terms of an exclusive recording contract between RAL and Dennis. The majority holds that the trial court abused its discretion by holding that RAL had a probable right to recover. This holding is based on the majority's opinion that the provisions in the recording contract most closely resemble those of an employment contract without a definite term, which under the authority of cases such as *Hussong v. Schwan's Sales Enter., Inc.,* 896 S.W.2d 320, 324 (Tex.App.— Houston [1st Dist.] 1995, no writ) and *Webber v. M.W. Kellogg Co.,* 720 S.W.2d 124, 127 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) allow either party to such a contract to terminate it at will, as the majority impliedly holds Dennis has done. Thus, the majority holds that the contract is unenforceable against Dennis, and that it cannot serve as a basis for injunctive relief against him and Ichiban.

I disagree with this holding for two reasons, either one of which is a sufficient basis not to overrule the trial court's order.

### Failure to Preserve Complaint on Appeal

First, Dennis failed to preserve this ground of reversal for review. Nowhere in the record does Dennis argue to the trial court that the agreement is an employment contract without a definite term. In fact,

*v. Diserens,* 144 Tex. 107, 188 S.W.2d 568 (1945) (one year); *Matuszak v. Houston Oilers, Inc.,* 515 S.W.2d 725 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ) (four years); *Dallas Cowboys Football Club, Inc. v. Harris,* 348 S.W.2d 37 (Tex.Civ.App.—Dallas 1961, no writ) (two years); *Lumley v. Wagner,* 42 Eng.Rep. 687 (Ch.1952) (three months).

**9.** The dissent maintains that the theory of no definite term was asserted for the first time on appeal. We disagree. Even the piece of trial argument quoted by the dissent referred to the fact that the contract was in perpetuity. The contract itself revealed that RAL was not clearly entitled to injunctive relief, which is required by law. *Siddiqui v. West Bellfort Prop. Owner's Ass'n.,* 819 S.W.2d 657, 658 (Tex.App.—El Paso 1991, no writ).

Dennis firmly asserted to the trial court that the agreement was unenforceable because it was an invalid covenant not to compete.[1]

The majority acknowledges that even in their initial briefs, Dennis and Ichiban contended the contract is unenforceable because of the invalid covenant not to compete, citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670 (Tex.1990). The majority acknowledges that it was only in its reply brief that Dennis, for the first time, alternatively asserted that this was an employment contract where the terms of the contract are indefinite or terminable at the discretion of one or both parties.

The extraordinary nature of injunctive relief requires the party seeking the injunction to show himself clearly entitled to such relief. *Siddiqui v. West Bellfort Prop. Owners Ass'n*, 819 S.W.2d 657, 658 (Tex.App.—El Paso 1991, no writ). A party seeking an injunction cannot rely on the verified pleading rules to limit the defense of the nonmovant. *Executive Tele–Commun. Sys., Inc. v. Buchbaum*, 669 S.W.2d 400, 403 (Tex.App.—Dallas 1984, no writ). Nevertheless, in my opinion, the non-movant cannot show an abuse of the trial court's discretion based on a theory presented for the first time on appeal. A trial court's discretion must be evaluated on the basis of its decision upon the arguments presented to it.

The reason for requiring the parties to present their arguments to the trial court is so that the trial court and opposing parties are alerted to the respective positions of all parties. It is upon those respective positions that the trial court rules. A trial court does not abuse its discretion when its decision is correct based on the arguments presented to it. To hold otherwise would be to violate the rule that the appellate court cannot substitute its judgment for that of the trial court. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978).

I would hold that, faced with the choice between (1) the position of Dennis and Ichiban that this was a covenant not to compete and (2) the position of RAL that this was a personal service contract with a restrictive covenant, the trial court did not abuse its discretion by finding that it was the latter.

## Contract Enforceable, Not Terminable at Will

Second, I disagree with the majority's opinion that the agreement in question is an employment contract without a definite term, terminable at the will of either party. To support its conclusion, the majority cites *Hussong* and *Webber*. Those cases do not involve personal services contracts, such as the one here between Dennis, a rap star, and RAL, a recording company. Hussong was employed as a sales manager and Webber as an engineer-attorney.

The agreement in this case is much more like a personal service agreement with a negative covenant for a definite term than it is like an employment contract without definite terms, terminable at will. While it is true that this agreement does not have an explicit term stated in a number of years as in the usual personal service contract,[2] its ending point is sufficiently ascertainable to be enforceable. Furthermore, it is not terminable at will simply because RAL had the option not to renew at the end of each term.

### a. The Contract

The contract provides as follows:

1. *TERM*

    1.01 The term of this Agreement shall commence on the date hereof and shall

---

1. Counsel for Dennis stated it this way:

    We have taken the position pretty consistently that it is an unenforcible [sic] covenant not to compete under Texas law. We took the position at the injunction hearing that's what it was, and we will take the position before the Appellate Court that the plaintiff, the movants, never met their burden of establishing reasonableness in scope, geography or limitation, never asked the Court to modify the original contract, which the Court will recall covered the universe and was in perpetuity. As a result, under well established statutory and common law with respect to covenants not to compete, they never, with respect to restraining my client from competing with them, even established the prima facie facts required by the statute.

2. See cases cited at footnote eight of the majority opinion; the cases concern personal service contracts with restrictive covenants that range in duration from three months to five years.

continue, unless extended as provided herein (such term, including any extensions, to be hereinafter referred to as the "Term"), for *a first Contract Period ending nine (9) months after* the earlier of the following:

(a) *The date of completion* of the lacquer, copper or equivalent Master Recordings to be used in manufacturing the disc Phonograph Record units to be derived from the last Masters made in fulfillment *of your Recording Commitment for that Contract Period* under paragraph 3.01 below; or

(b) The date thirty (30) days after you give us notice that you have completed the Delivery of those Masters, provided Delivery had in fact been completed.

1.02   You hereby grant us *nine (9) separate options to extend the Term for nine (9) additional Contract Periods* ("Option Periods") on the same terms and conditions applicable to the first Contract Period except as provided herein.   Each such option shall be deemed to be exercised by us and shall commence immediately upon expiration of the current Contract Period unless we shall give you written notice to the contrary at least ten (10) days prior to the date that the then current Contract Period would otherwise expire....

3.   *RECORDING COMMITMENT*

3.01   During the first Contract Period you shall perform for the recording of Masters sufficient to constitute one (1) or more Singles (the total number of Masters of which shall be determined by us in our sole discretion), and Deliver such Masters to us, plus, during the first Contract Period, you shall record and deliver at our option, such additional Masters as shall in the aggregate constitute one (1) Album. During the second and each subsequent Contract Period *you shall perform for the recording of Masters sufficient to constitute one (1) Album,* and Deliver such Masters to us, plus, during the first Contract

Period and during each subsequent Contract Period, you shall record and deliver at our option, one (1) additional Album. The aggregate number of Masters required to be recorded during each Contract Period shall be hereinafter referred to as the "minimum Recording Commitment" for each such Contract Period.

3.02   *You shall fulfill the minimum Recording Commitment for each Contract Period within the first three (3) months of the Contract Period and, with respect to any additional Album we may require during the first Contract Period and each subsequent Contract Period, such Album shall be recorded and delivered to us within three (3) months of our notice to you* of your obligation to record such Album.

(Emphasis added).   The basic provisions pertinent here are:

1.   Dennis shall record sufficient Masters for an album within the first three months;

2.   RAL may require an additional album within an additional three-month period; [3]

3.   Nine months after these recording commitments are fulfilled the contract period ends; and

4.   RAL has the option to extend the contract for up to nine additional contract periods.

b.   **Terminability**

The contract allows RAL to exercise an option not to renew at the end of term.   It does not give RAL the option to terminate the contract at will, i.e., at any time it wants. There is nothing in the contract which allows Dennis to terminate.   Therefore, I would hold that the contract is not terminable at the will of either party.   Thus, even if Dennis and Ichiban had taken the position below that this was an employment contract terminable at will by either party, it would not have been an abuse of discretion for the trial court to have found otherwise.

---

**3.**   It appears that RAL could wait nearly nine months after Dennis completed his first album before requiring a second album, after which

another nine months must pass before the contract period terminated.

### c. Duration

As to being indeterminate in duration, the contract provides for a maximum of 10 terms of from 12 to 24 months,[4] each successive term renewable at the option of RAL. The contract contemplates that: Dennis would provide an album within the first three months of the contract period; RAL could require a second album within the contract period to be recorded within three months; and the contract period would end nine months after the last recording. While this determination is conditioned upon performance by Dennis, it provides a sufficient basis upon which to enforce it for failure to perform. For example, assuming Dennis has provided two albums, he has at least eight contract periods left to perform. Assuming RAL exercises its options for an additional album as late in each contract period as possible, and assuming RAL's exercise of its option to renew at the conclusion of each interim contract period, the time remaining for Dennis to perform is 16 years. This produces a ready measure of duration for injunction purposes.

Therefore, even if Dennis and Ichiban had taken the position below that this was an interminable employment contract, I would hold that the trial court would not have abused its discretion in holding that this is a restrictive covenant of a personal services contract which is sufficiently determinant to enforce by injunction.

### Summary

Because I think the majority errs procedurally in considering a theory advanced for the first time on appeal, and substantively in finding the contract in question to be an employment contract terminable by either party and indeterminate in duration, I respectfully dissent.

---

4. The shortest contract period would consist of 12 months where Dennis recorded an album in three months and RAL did not require an additional album. The contract period would terminate nine months later. The longest contract period would consist of 24 months where Dennis recorded an album in three months, RAL waited nearly nine months to request an additional album, Dennis recorded it within three months, and the contract period would terminate nine months later.