02-10-474-CV_REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00474-CV


 
 
 Heritage Operating, L.P. d/b/a Metro Lift Propane
 of Dallas
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Rhine Brothers, LLC, DFW Propane Exchange, LLC,
 Kendall L. Rhine, Kendall T. Rhine, Anthony L. Rhine, Janice Rhine, and James
 Marcus Withers
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 153rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

We
have considered appellant Heritage Operating, L.P. d/b/a Metro Lift Propane of
Dallas’s (Heritage) motion for rehearing and appellees Rhine Brothers, LLC, DFW
Propane Exchange, LLC, Kendall L. Rhine, Kendall T. Rhine, Anthony L. Rhine,
Janice Rhine, and James Marcus Withers’s motion for rehearing and motion for
reconsideration en banc.  We deny the motions but withdraw our March 15, 2012
opinion and substitute the following.

Heritage
appeals the trial court’s take-nothing judgment in this case concerning breach
of a covenant not to compete.  We reverse and remand.

Background
Facts

Appellee
Kendall L. Rhine became an officer, director, and shareholder of Metro Lift
Propane in 1997.  At that time, Metro Lift had locations in Atlanta and
Nashville.  By 2003, Metro Lift had ten locations, including one in Grand
Prairie.  Kendall L.’s son, Anthony Rhine, ran the Grand Prairie Metro Lift
location.

On January
1, 2004, Kendall L. and the other owners of Metro Lift sold Metro Lift’s ten
locations to Heritage.  Heritage and the Metro Lift owners were all represented
by counsel during the sales negotiations.  Heritage paid $15,464,663.44 for the
company.  Kendall L. and the other former owners were offered positions with
Heritage.  Kendall L. declined.

As
part of the sale, Kendall L. and the other former owners were asked to sign noncompetition
agreements.  Heritage agreed to pay Kendall L. $500,000 to sign the noncompete,
paid out over five years.  The agreement stated, in part,

[Kendall L.] agrees
that for a period of ten (10) years, commencing with the date of this
Agreement, he will not:

 

(a) Engage in the business
of the propane cylinder exchange business within a 75-mile radius of . . . any
of the operations of [Metro Lift locations] (the “Restricted Area”).

 

. . . . 

 

(d) Furnish, divulge,
or make accessible to anyone any confidential or proprietary information or
trade secrets (“Confidential Information”) concerning the Metro Lift Business
including, but not limited to, customer identification, customer lists,
business records and supply cost and pricing data.  Notwithstanding the
foregoing, such Confidential Information shall not include:  (i) information
that is or becomes generally available to [Kendall L.] on a non-confidential
basis from a source other than Heritage or its affiliates provided that such
source is not bound by an agreement of non-disclosure to Heritage.

 

(e) Provide to,
arrange for, guarantee funds, or arrange for product supply or consumer tank or
cylinder purchases to any person who engages [in the propane cylinder exchange
business] in the Restricted Area.

 

(f)
Be a member of a partnership or a stockholder, investor, officer, director,
employee, agent, associate, or consultant, of any person, partnership, or
corporation which does any of the acts described in the foregoing
subparagraphs.

In “[l]ate
2008, early 2009,” Kendall L.’s wife, Janice Rhine, began investing in propane
cylinder exchange businesses owned and operated by Kendall L.’s sons, Kendall
T. and Anthony Rhine, including DFW Propane, in Grand Prairie.[2]
 Kendall L. testified that his wife has not worked outside their home in forty
years and does not possess much knowledge about running a cylinder exchange
business.  Janice Rhine testified that at least one check she signed for DFW
Propane came from a joint account she shared with Kendall L.  She also
testified that Kendall L. would write checks out of her living trust and that she
would reimburse him by putting money back in his account.  Kendall L. also wired
$221,062.95 to a title company for the purchase of property for DFW Propane.  Kendall
L. wrote checks out to DFW Propane and had his wife sign them.

Heritage
sued Kendall L., his sons, and his wife, among others, for breach of contract,
trade secret misappropriation, interference with contract, tortious
interference with contract and prospective business relations, civil conspiracy,
and aiding and abetting.  Heritage also sought an injunction against the
Rhines.  A jury found that Kendall L. violated his noncompete, that all of the
defendants intentionally interfered with Kendall L.’s noncompete, and that the
defendants conspired against Heritage, but that Heritage had suffered zero
dollars in lost profits or loss of goodwill or reputation.[3]

The
trial court then entered a judgment finding that the noncompete was
unreasonable and thus, void.  The trial court granted judgment in favor of the
defendants and denied injunctive relief.  The trial court made the following relevant
findings of fact and conclusions of law:

6.    The
confidential information of [Metro Lift] consisted of customer identification
and history, sales, inventory[,] and operational procedure.

 

7.    The
confidential information of [Metro Lift] was neither complex nor difficult to
independently obtain or create.

 

8.    The value, if
any, of the confidential information of [Metro Lift] quickly eroded after the
sale of [Metro Lift] to [Heritage] and was essentially non-existent two (2)
years after the sale.

 

9.    The enforcement
of Kendall L. Rhine’s non-competition agreement beyond five years after the
sale of [Metro Lift] to [Heritage] was not necessary to protect any legitimate
business interest of [Heritage].

 

10.   The Kendall L.
Rhine non-competition agreement was unreasonable in scope and time and greater
than necessary to protect the goodwill and business interests of [Heritage].

 

11.   [The] Kendall
L. Rhine non-competition agreement would be reasonable if limited to a time
period not to exceed five (5) years.

 

12.   Kendall L.
Rhine did not take any action prior to the fifth year anniversary of the
non-competition agreement which violated its terms.

 

          . . . . 

 

1.    Kendall L.
Rhine’s non-competition agreement is reformed in that its term is reduced to
five (5) years from the date of its execution.

 

2.    Permanent
injunctive relief is neither warranted nor equitable under the facts of this
case.

This
appeal followed.

Discussion

1.  The
reasonableness of the noncompete

In
its first issue, Heritage complains of the legal and factual sufficiency of the
evidence supporting the trial court’s finding that the limitations of the
noncompete are unreasonable.

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

In
his motion for rehearing and motion for consideration en banc, Kendall L. Rhine
argues that this court erroneously applied Texas law.  The noncompete agreement
contains a choice of law provision that states, “The laws of the State of Delaware
shall govern this Agreement.  The parties hereto agree and consent to the
jurisdiction of the courts in the city and state in which [Kendall L. Rhine]
resides to adjudicate all claims and controversies arising under this
Agreement.”  As Rhine pointed out in his brief on appeal, Texas courts will
enforce a choice of law provision unless it is contrary to Texas public policy. 
See DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990), cert.
denied, 498 U.S. 1048 (1991).  The court must determine

first, whether there
is a state the law of which would apply under section 188 of the Restatement absent
an effective choice of law by the parties, or in other words, whether a state
has a more significant relationship with the parties and their transaction than
the state they chose; second, whether that state has a materially greater
interest than the chosen state in deciding whether this noncompetition
agreement should be enforced; and third, whether that state’s fundamental
policy would be contravened by the application of the law of the chosen state
in this case.

Id. at
678.

Delaware
has a substantial relationship to the parties because Heritage’s corporate
offices are located there.  However, Texas has a more significant relationship
to the parties and the transaction because two of the ten Metro Lift locations
from which Kendall L. Rhine was restricted were located in Texas and none of
the locations were in Delaware.[4]  Second, Texas has a
materially greater interest than does Delaware in “protecting the justifiable
expectations of entities doing business” in this state.  Id. at 679
(refusing to apply a choice of law provision because Texas had a materially
greater interest than Florida because Florida’s interest in the contract was “limited
to protecting a national business headquartered in that state”).  Finally, in DeSantis,
the supreme court explicitly stated that “the law governing enforcement of
noncompetition agreements is fundamental policy in Texas.”  Id. at 681. 
Based on the factors outlined in DeSantis, we decline to apply Delaware
law in this case.

The Covenants
Not to Compete Act states,

[A] covenant not to
compete is enforceable if it is ancillary to or part of an otherwise
enforceable agreement at the time the agreement is made to the extent that it
contains limitations as to time, geographical area, and scope of activity to be
restrained that are reasonable and do not impose a greater restraint than is
necessary to protect the goodwill or other business interest of the promisee.

Tex.
Bus. & Com. Code Ann. § 15.50(a) (West 2011).  A covenant not to compete is
a restraint of trade and unenforceable as a matter of public policy unless it
meets a reasonableness standard.  Juliette Fowler Homes, Inc. v. Welch Assocs.,
793 S.W.2d 660, 662 (Tex. 1990); Martin v. Credit Prot. Ass’n, 793
S.W.2d 667, 668 (Tex. 1990).  Whether an agreement not to compete is a
reasonable restraint of trade is a question of law for the court.  Peat
Marwick Main & Co. v. Haass, 818 S.W.2d 381, 388 (Tex. 1991); Martin,
793 S.W.2d at 668–69.  Restraints are unreasonable if they are broader than
necessary to protect the legitimate interests of the employer.  DeSantis,
793 S.W.2d at 681–82; Henshaw v. Kroenecke, 656 S.W.2d 416, 418 (Tex. 1983).

The
trial court found that the noncompete was unreasonable in both scope and time. 
The only reformation the trial court made, however, was to the time period, and
the trial court found that the noncompete would be reasonable if it were reduced
to five years.[5]  Thus, we will evaluate
only whether the ten-year prohibition period is unreasonable.

We
first note that it was Kendall L.’s burden to establish that the noncompete
limitations were greater than was necessary.  Tex. Bus. & Com. Code Ann. § 15.51(b)
(West 2011) (stating that it is the promisor’s burden to establish that the
noncompete is not reasonable when the primary purpose of the agreement to which
the covenant is ancillary is not to obligate the promisor to render personal
services).  To meet this burden, Kendall L. argued that the evidence was that
any confidential information eroded in value quickly.  However, Kendall L. has not
addressed Heritage’s claim that it also bought Metro Lift’s goodwill.

Goodwill
is a protectable, valuable interest, and parties may determine its value and
contract for its sale.  Marsh USA Inc. v. Cook, 354 S.W.3d 764, 777
(Tex. 2011) (“Texas law has long recognized that goodwill, although intangible,
is property and is an integral part of the business just as its physical assets
are.”).  Goodwill is defined as a “business’s reputation, patronage, and other
intangible assets that are considered when appraising the business,
esp[ecially] for purchase; the ability to earn income in excess of the income
that would be expected from the business viewed as a mere collection of assets.” 
Black’s Law Dictionary 763 (9th ed. 2009).

Kendall
L. presented evidence through a number of witnesses that some intangible
interests (specifically, customer and pricing lists) eroded in the first five
years after the sale, but he did not present evidence that all of Metro
Lift’s intangible interests eroded in the first five years.  Tom Harlan,
another former owner of Metro Lift, testified that any customer and pricing
lists that were sold with Metro Lift would have no value after five years. 
Harlan was not asked about the value of Metro Lift’s goodwill.  The only
evidence on goodwill came from Eric Beatty, chief legal officer of Heritage,
who testified,

[O]ne of those
critical assets that Heritage can purchase is the future patronage of those
customers.  Goodwill.  And one of the most critical concerns that I—I feel
comfortable saying on behalf of Heritage is that we have the ability to ensure
that we can protect that future patronage.  And the only way to do that is to
ensure that our seller, who knows that business infinitely better than we do
for that location, will not come back in and take that goodwill right back.

Beatty
testified that the parties valued Metro Lift’s goodwill and other intangible
assets at the time of closing and attributed $7 million of the purchase price
to them.

A noncompete
signed by an owner selling a business is quite different than one signed by an
employee.  Marsh USA Inc., 354 S.W.3d at 790 n.5 (noting that section
15.50 does not address the “distinction between what type of agreement is
enforceable to protect goodwill in the context of the sale of a business and
the context of a post-employment restriction”); see Hill v. Mobile Auto
Trim, Inc., 725 S.W.2d 168, 177 (Tex. 1987) (Gonzalez, J., dissenting) (noting
that courts “scrutinize covenants not to compete in employment relationships
more closely than covenants not to compete associated with the sale of a business”),
superseded by statute, Tex. Bus. & Com. Code Ann. § 15.50(a).  Courts
have been more inclined to enforce a long or limitless time period barring competition
after a sale of a business.  See, e.g., Oliver v. Rogers, 976
S.W.2d 792, 801 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (holding that
a lack of a time limitation did not render noncompete unreasonable as a matter
of law); Greenstein v. Simpson, 660 S.W.2d 155, 159 (Tex. App.—Waco
1983, writ ref’d n.r.e.) (“[A] person may agree[] in connection with the sale
of his business[] not to re-enter a similar competitive business for the
remainder of his life.”); York v. Dotson, 271 S.W.2d 347, 348 (Tex. Civ.
App.—Fort Worth 1954, writ ref’d n.r.e.) (“One may lawfully agree not to
compete in a particular business, in a reasonably limited territory, during the
remainder of his life.  Such contracts are held not to be in restraint of
trade.”); Clay v. Richardson, 290 S.W. 235, 236 (Tex. Civ. App.—Fort
Worth 1926, writ dism’d w.o.j.) (upholding covenant of theater seller never to
open a theater again in town where theater was located).

Kendall
L. is “semiretired,” does not live in Texas, and he has ownership interests in propane
cylinder exchange companies in locations across the country, including Florida,
Illinois, Indiana, and Alabama.  Kendall L. presented no evidence of any great
hardship borne by him by staying out of the Grand Prairie area, nor did he
demonstrate any injury to the public that outweighs the legitimate benefits
that the negotiated noncompete granted to Heritage.  See DeSantis, 793
S.W.2d at 681–82 (noting that a noncompete is reasonable if neither hardship to
the promisor nor public injury outweighs the covenant’s legitimate benefits to
the promisee).

Kendall
L. was represented by counsel during the sale negotiations.  He testified that
although Heritage drafted the contracts, he and his attorney negotiated terms
of the sale.  He was aware that if he did not agree to a noncompete, there
would be no deal with Heritage, and he did not think there was anything unfair
about Heritage’s request that he sign a noncompete.  Kendall L. testified that
he fully understood he would be bound by the noncompete and that he could open
up propane cylinder exchange businesses anywhere in the country except within seventy-five
miles of the listed prohibited cities.  When asked at trial if he thought it
was fair to him that he sign the noncompete, he responded, “Yeah, I got money
for it.”  Heritage valued the intangible assets of Metro Lift at $7 million and
had the former owners sign noncompete agreements to protect the value of those
intangibles, including Metro Lift’s goodwill.  Kendall L. was paid half a
million dollars separately from the sale of the business to agree to the ten-year
noncompete period, and Heritage has paid Kendall L. the agreed-to price.[6]

Based
on the evidence described above, we do not believe that Kendall L. demonstrated
that it was unreasonable of Heritage to protect its $7 million investment for a
period of ten years.  Nor, as discussed above, do we believe that a ten-year noncompete
period is unreasonable as a matter of law when ancillary to a contract for the sale
of a business.  See Oliver, 976 S.W.2d at 801; Greenstein, 660
S.W.2d at 159.  We hold that the evidence is legally and factually insufficient
to support the trial court’s finding that the limitations of the noncompete are
unreasonable.  We sustain Heritage’s first issue.

2.  Permanent
injunction

In
its second issue, Heritage argues that the trial court erred by refusing to
enter a permanent injunction against Kendall L. to enforce the noncompete.

The
noncompete agreement included a provision that allowed for injunctive relief. 
The provision read,

[Kendall
L. Rhine] agrees that the covenants contained in this section relate to matters
which are of special and unique character which give Heritage peculiar value
impossible of replacement, and for the lack of which Heritage cannot be
reasonably or adequately compensated in damages . . . .  [I]f [Kendall L.
Rhine] should breach this Agreement, Heritage’s damages will be difficult to
determine, if not impossible to determine.  Therefore, [Kendall L. Rhine]
expressly agrees that in addition to the right to recover damages, Heritage
shall be entitled to injunctive and/or equitable relief to prevent a breach
hereof, and to secure the enforcement hereof.

The
decision to grant or deny a permanent injunction is ordinarily within the sound
discretion of the trial court.  Butnaru v. Ford Motor Co., 84 S.W.3d
198, 204 (Tex. 2002).

Under
the common law, a party seeking an injunction must show that without injunctive
relief he will suffer irreparable injury for which he has no adequate legal
remedy.  Tom James Co. v. Mendrop, 819 S.W.2d 251, 252 (Tex. App.—Fort
Worth 1991, no writ).  However, in its motion for rehearing, Heritage notes
that if a party relies on a statute that defines the requirements for
injunctive relief, then the express statutory language supersedes common law
requirements.  Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d 787,
795 (Tex. App.—Houston [1st Dist.] 2001, no pet.).  The Covenants Not to
Compete Act provides for “damages, injunctive relief, or both” for a breach of
a noncompete by the promisor.  Tex. Bus. & Com. Code Ann. § 15.51(a). 
Thus, a party seeking injunctive relief under the Covenants Not to Compete act
does not have to show irreparable injury for which he has no adequate legal
remedy as a prerequisite to injunctive relief.  See Letkeman v. Reyes,
299 S.W.3d 482, 486 (Tex. App.—Amarillo 2009, no pet.) (“It is enough simply to
prove a distinct or substantial breach.”); see also Tex. Bus. & Com.
Code Ann. § 15.52 (stating that “the procedures and remedies . . . provided
by Section 15.51 . . . are exclusive and preempt any other criteria for
enforceability of a covenant not to compete or procedures and remedies in an
action to enforce a covenant not to compete under common law or otherwise”).

We
acknowledge that Heritage is correct that it did not have to show irreparable
injury for
which it has no adequate legal remedy in order to secure an injunction.  However,
because we are remanding the case for a new trial, we do not reach a conclusion
on Heritage’s second issue.  On remand, the trial court will have the
opportunity to review Heritage’s request for injunctive relief again.

3.  Damages

In
its third issue, Heritage argues that the jury’s finding that it suffered zero
damages is against the great weight and preponderance of the evidence and is manifestly
unjust.  In response to four questions on damages, the jury awarded zero
dollars.  After trial, Heritage moved for the entry of judgment, requesting
that the trial court disregard the jury’s answers to the damages questions.  Heritage
also moved for a judgment notwithstanding the verdict and a new trial on the
grounds that the $0 damage award was manifestly too small.

In
reviewing an issue asserting that the jury’s failure to make a finding is
“against the great weight and preponderance” of the evidence, we must consider
and weigh all of the evidence and set aside the finding only if the evidence is
so weak or the finding is so contrary to the great weight and preponderance of
the evidence as to be clearly wrong and unjust.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001); In re King’s Estate, 150 Tex. 662, 665, 244
S.W.2d 660, 661 (1951).  When there is objective evidence of injury, a jury’s
award of zero damages is against the great
weight and preponderance of the evidence.  Horton v. Denny’s Inc., 128
S.W.3d 256, 260 (Tex. App.—Tyler 2003, pet. denied); Davis v. Davison,
905 S.W.2d 789, 791 (Tex. App.—Beaumont 1995, no writ).

Heritage
presented the testimony of Mark Rambin, a certified public accountant.  Rambin
reviewed the sales transactions and financial statements of Metro Lift from
2004 to mid-2010 and “certain financial information” from DFW Propane, and he rendered
an opinion on Heritage’s lost net profits from 2009 through the end of the
noncompete period in 2013.  DFW Propane produced in discovery eighteen sales
contracts it had with former Heritage customers.  In 2008, Heritage had made a
net profit of $72,000 from those customers.  Rambin then made a projection of what
the future sales to those eighteen customers would have been from 2010 through
2013.  He estimated that Heritage lost $287,970 in net profit from the loss of
those customers.  Rambin then applied a “discount” to “account[] for the risk
that a business activity may not happen as it was projected to happen.”  The
discount accounts for lost customers, changes in the economy, and “any variable
that might impact the ability of the business to achieve its objectives.”  Rambin’s
adjusted lost net profit estimation was $235,202.

Kendall
L. did not present a competing expert, but he did challenge Rambin’s
calculations because one of the companies with a contract with DFW Propane, Ram
Tool, did not ultimately buy its propane from DFW Propane.  Rambin responded,

I’m not certain it
impacts [the projected lost net profits], because as I was able to see, those
sales [to Ram Tool] did tail off.  So Heritage lost that business.  There’s a
contract showing that DFW [Propane] somehow had some contact with them and
ultimately Heritage lost that business.  So I’m not certain it has an impact on
that calculation.

Kendall
L. also implied that another former customer, Big D Clutch, was no longer in business. 
Rambin explained that it would not affect his calculation because “that’s the
type of thing that the discount rate and the fact that I didn’t increase the
sales adjusts for.  Those types of business risks are part of that calculation.”
 This “discount” he applied to his projection “takes into consideration the
time value of money, the interest factor, as well as the business risk factor.”
 He defined the business risk factor as “[a]ny type of uncertainty[] that a
business might go out of business, the economy might change, different things
might happen.”  Thus, he explained the discount rate accounted for companies
like Big D Clutch going out of business.

Kendall
L. presented testimony from five former customers of Metro Lift who had signed
contracts with DFW Propane.  All five former customers testified that they left
Metro Lift for DFW Propane because DFW Propane offered a better price.  Only two
customers testified that they were actively looking for a new provider,
and only one of those could testify that he recalled that he contacted DFW
Propane before DFW Propane contacted him.  The other three testified that DFW
Propane solicited them.  That DFW Propane offered a lower rate might explain
why a customer might have left Metro Lift for DFW Propane, but it is not any
defense to Metro Lift’s contention that it lost business because of DFW Propane’s
presence in its area.  DFW Propane’s own witnesses demonstrated that Metro Lift
lost customers because DFW Propane took them.  Even if Kendall L. challenged Rambin’s
methodology in making his future lost profit projections, Kendall L. did not
challenge the evidence, including signed contracts produced by DFW Propane,
that Metro Lift’s former customers left Metro Lift for DFW Propane.

Thus,
while there was evidence that not all of the contracts DFW Propane provided
resulted in sales, there was uncontroverted evidence that Metro Lift did lose some
sales to DFW Propane.  See D/FW Commercial Roofing Co. v. Mehra, 854
S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ) (“A party must show either a
history of profitability or the actual existence of future contracts from which
lost profits can be calculated with reasonable certainty.”).  Those contracts,
along with Rambin’s testimony on Metro Lift’s financial records, also provided
some evidence of how much profit Metro Lift lost from those customers.  See
ERI Consulting Eng’rs, Inc. v. Swinnea, 318 S.W.3d 867, 876 (Tex. 2010)
(“Recovery for lost profits does not require that the loss be susceptible of
exact calculation.”) (quoting Holt Atherton Indus., Inc. v. Heine, 835
S.W.2d 80, 84 (Tex. 1992)).  There is therefore some objective evidence of the
damages Heritage suffered.  See Horton, 128 S.W.3d at 260. Thus,
after having considered the evidence admitted, we hold that the evidence is
factually insufficient to support a finding of zero damages, so as to be
manifestly unjust, and we sustain that part of Heritage’s third issue.[7] 
We do not, however, hold that Heritage proved the amount of its damages as a
matter of law.  See Dow Chem. Co., 46 S.W.3d at 241
(noting that a “matter of law” issue “should be sustained only if the contrary
proposition is conclusively established”).  Although the contracts provide
reasonably certain evidence of lost profits, Kendall L. disputed that all of
the contracts led to sales.  A lost profits calculation “is a fact intensive
determination,” Holt Atherton Indus., 835 S.W.2d at 84, and it is not
our province to “find facts,” Pool, 715 S.W.2d at 634.  Because we
cannot say that Heritage established its damages as a matter of law, we cannot
render a damages award.  See Guevara v. Ferrer, 247 S.W.3d 662,
670 (Tex. 2007) (nothing that when there is evidence to support some damages it
is not appropriate to render judgment but it is appropriate to remand for a new
trial).

On
rehearing, Kendall L. Rhine argues that the trial court abused its discretion
in failing to exclude Rambin’s testimony.  Rhine argues that Rambin’s testimony
was not reliable because it was based on speculation and not on objectively
verifiable data.  To determine whether a trial court abused its discretion, we
must decide whether the trial court acted without reference to any guiding
rules or principles; in other words, we must decide whether the act was
arbitrary or unreasonable.  Low v. Henry, 221 S.W.3d 609, 614
(Tex. 2007); Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  An
appellate court cannot conclude that a trial court abused its discretion merely
because the appellate court would have ruled differently in the same
circumstances.  E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 558 (Tex. 1995); see also Low, 221 S.W.3d at 620.  Expert
testimony is admissible when the expert is qualified and the testimony is
relevant and based on a reliable foundation.  See Robinson, 923 S.W.2d at
554.  Rhine only challenges Rambin’s testimony on the grounds that it was not
based on a reliable foundation.

Prior
to trial, Rhine moved to exclude Rambin’s testimony as unreliable because
Rambin’s opinion was based on “illustrations of potential lost profits” and
based on clients that Heritage believed, but had not verified, that it had lost
to Metro Lift.  Rambin’s deposition testimony, attached to Rhine’s motion to
exclude and Heritage’s response to the motion, shows that he had received
historical sales information from Heritage and had requested sales information
from DFW Propane, but had not yet received it.  Prior to his deposition, Rambin
produced documents to Rhine demonstrating “how [he] would intend to calculate
[a lost profit estimate] if—based on if we got the complete information.”  He
explained, “I have not been provided with the detailed sales information for
DFW Propane, and that—I believe that information is going to be more
determinative of what DFW Propane has actually done and that would be more
indicative of the lost profits that Metro Lift would have incurred relative to
the matters at issue in this lawsuit.”  Rambin testified that he

got the detailed
sales information by customer, by transaction, for—I believe going back to
sometime in 2005 to essentially the present and analyzed that information on a
customer-by-customer basis, including the cost of sales, and analyzed
persistency of customer relationships, the profitability of customer
relationships, the volume of customer relationships.

The
trial court overruled Rhine’s objections.  Right before trial, Rambin submitted
revised calculations that included the “discount” rate.  Rhine objected again,
and the trial court overruled Rhine’s objection again, stating, “If the only
difference between his opinion as of before 30 days prior to trial and the
supplement . . . is discount, I anticipate that that will probably be an area
of cross-examination or rebuttal.”  On rehearing, Rhine objects to Rambin’s
testimony on the grounds that (1) Rambin’s opinions were projections and not
based on hard facts; (2) Rambin could not verify which customers actually moved
their business to DFW Propane; and (3) Rambin “did not know the cost of propane
in 2011, 2012, and 2013 or what Heritage’s margins would be in the future.”

Rambin’s
methodology of using Metro Lift’s historical sales data before and after DFW
Propane’s entry into the market and then projecting Heritage’s lost future
profits is an acceptable method for calculating lost profits.  See Swinnea,
318 S.W.3d at 877 (“Contrasting revenue from a time period immediately before
the period at issue is an established method of proving revenue for a lost
profit damages calculation.”); Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 505 (Tex. 2001) (noting that damages can be shown with reasonable
certainty by a profit history or some other objective data such as
future contracts); White v. Sw. Bell Telephone Co., 651 S.W.2d 260, 262
(Tex. 1983) (noting that pre-existing profits are admissible to show projected
lost profits with reasonable certainty).  That Rambin, when he testified on
October 22, 2010, could not foretell the cost of propane in 2011, 2012, or 2013
does not mean that his calculations are unreliable.  Rambin used competent,
historical data to compute past trends and to make estimations about future
sales.  This is more than mere speculation.  See Helena Chem. Co., 47
S.W.3d at 506 (holding that evidence of past net profits coupled with facts and
circumstances of future costs was sufficient to support award of estimated
future profits).  It is true that Rambin’s calculations included customers that
Heritage believed it lost because of Kendall L. Rhine’s breach of the
noncompete but, in fact, had not lost because of the breach.  “Weaknesses of
the facts, however, in support of an expert’s opinion go to the weight of his
testimony not its admissibility.”  Tenngasco Gas Gathering Co. v. Bates,
645 S.W.2d 496, 498 (Tex. App.—Corpus Christi 1982, writ ref’d n.r.e.) (holding
that trial court did not err in admitting expert testimony on value of property
when expert based his opinion on the value of other, arguably similar
property).  On cross-examination, Rhine properly challenged whether the
customers in question left Heritage because of Rhine’s breach of the
noncompete.  See Swinnea, 318 S.W.3d at 878 (noting that the defendant
bears the burden of proving that “an otherwise complete lost profits
calculation is in fact missing relevant credits”).  Thus, we cannot say the
trial court abused its discretion in admitting Rambin’s expert testimony.  We
overrule Rhine’s cross issue.  Because we have sustained Heritage’s third issue
as to factual insufficiency, we do not need to address Heritage’s fourth issue
(regarding nominal damages) or fifth issue (regarding the exclusion of
evidence).  See Tex. R. App. P. 47.1; see also MBM Fin. Corp.
v. Woodlands Operating Co., 292 S.W.3d 660, 665 (Tex. 2009) (“[N]ominal
damages are not for compensation; they are for cases in which there are no damages,
or none that could ever be proved.”).

Conclusion

Having
sustained Heritage’s first issue and part of its third issue, and having
declined to reach its fourth and fifth issues, we reverse the trial court’s
judgment as to the reasonableness of the noncompete and as to damages.  Our
resolution does not disturb the jury’s findings on liability.  However, we are
required to remand this proceeding for a new trial on liability and damages.  See
Tex. R. App. P. 44.1(b) (prohibiting a separate trial solely on unliquidated
damages when liability is contested); see also Estrada v. Dillon, 44
S.W.3d 558, 562 (Tex. 2001) (stating party’s failure to present on appeal an
additional discrete challenge to liability when party challenges damages does
not defeat plain language of rule 44.1(b)).  We therefore reverse the trial
court’s judgment and remand for a new trial.

 

LEE GABRIEL
JUSTICE

 

PANEL:  GARDNER,
MEIER, and GABRIEL, JJ.

DELIVERED:  June 21, 2012









[1]See Tex. R. App. P. 47.4.





[2]Kendall T. and Anthony
Rhine, as managers of Metro Lift locations, had also signed noncompetes in
conjunction with the Metro Lift sale.  Kendall T. had been restricted from
North Carolina for five years, and Anthony was restricted from Texas for five
years.  Janice Rhine did not have a noncompete.





[3]The jury also found that
Anthony did not violate his noncompete and that no defendant misappropriated
trade secrets.  Heritage does not challenge these findings on appeal.





[4]The locations were
Charlotte and Mooresville, North Carolina; Dallas and Grand Prairie, Texas;
Houston, Texas; Louisville, Kentucky; Nashville, Tennessee; Epping, New
Hampshire; Boston and Taunton, Massachusetts; New Orleans, Louisiana; St.
Louis, Missouri; and Greensboro, North Carolina.





[5]In his motion for
rehearing and motion for reconsideration en banc, Kendall L. Rhine claims that
the trial court “also reformed the agreement so as to specifically limit the
scope of activity being restricted therein.”  But, as Rhine notes, the trial
court’s judgment states

The Court . . . finds that the limitations set forth in
the Non-Competition Agreement between [Heritage] and [Kendall L. Rhine] is
unreasonable as to time and scope of activity and is greater than would be
necessary to protect the goodwill and business interests of [Heritage].  [The]
Non-Competition Agreement is reformed by reducing the period of limitation to
five (5) years.  The Court further finds that the scope of activity in Section
1(e) of the Non-Competition Agreement is partially ambiguous and should be
construed to include the language “engages in the propane cylinder exchange
business” so that it reads as follows:

          (e) Provide to, arrange for, guarantee funds,
or arrange for product supply or customer tank or cylinder purchases to any
person who engages in the propane cylinder exchange business in the
Restricted Area.

The judgment
clearly states that the only reformation made was to the time period.  The
trial court construed the scope of activity to include language that was
unintentionally omitted from one of the six prohibited activities, but was
identical to language in all of the other noncompete agreements.  This change
did not reduce the scope of activity.





[6]It would seem that if the
noncompete were unenforceable, then the price paid for the unenforceable
promise would also be unenforceable.  See Sheline v. Dun & Bradstreet
Corp., 948 F.2d 174, 177 (5th Cir. 1991) (“The covenant not to compete and
the severance compensation clause were mutually dependent promises, and as
such, the unenforceability of one necessarily rendered the other unenforceable.”).





[7]In his motion for
rehearing and motion for reconsideration en banc, Kendall L. Rhine argues that
by so holding, this court “has chosen to essentially act as ‘jury number two’
and substitute [our] judgment for that of the jury.”  Rhine assumes that the
jury failed to award damages because it did not find Heritage’s witnesses’
testimony credible and that no evidence presented at trial establishes a causal
link between Rhine’s breach and Heritage’s lost profits.  Taking Rhine’s
assumption as true that the jury awarded zero damages because Heritage did not
demonstrate causation, the testimony of Rhine’s own witnesses who stated that
they left Metro Lift for DFW Propane and Rambin’s testimony that Metro Lift
would have made a certain profit from those customers is evidence that DFW
Propane caused Metro Lift to lose profits.